**CARTER OIL CO. et al. v. ELI et al.**

No. 20110. Opinion Filed Nov. 22, 1932.

Rehearing Denied Feb. 28, 1933.

Dissenting Opinion March 3, 1933.

Application for Leave to File Second Petition for Rehearing Denied April 4, 1933.

274

J. Wood Glass, F. A. Calvert, Y. P. Broome, W. P. McGinnis, James A. Veasey, and L. G. Owen, for plaintiffs in error.

John Barry, Reynolds & Williams, and Linebaugh & Pinson, for defendants in error.

KORNEGAY, J. This is a proceeding in error to review the action of the district court of Nowata county, decreeing an accounting in the original case of Taylor Eli et al. v. Carter Oil Co. et al., No. 5204 in said court. That case came to this court on proceeding in error to review the action of Judge Baskin, who held that the plaintiff Taylor Eli and his coplaintiffs, and T. C. Wilson, with whom they had made a contract to bring the suit, and R. E. Tucker were not entitled to the land involved, which was 80 acres of ground described as the E. ½ of the N. E. ¼ of section 8, twp. 28 N., R. 15 E. This was what was known as a dead claim, that is, the allottee died after September 1, 1902, but before the allotting officers made the allotment. It was allotted in the name of Nancy Eli, who was a daughter of Taylor Eli and a sister to James Eli and a half-sister to Charlotte Muskrat.

In order to secure an allotment for a dead person, it was necessary that some one should be appointed as administrator to make the selection, otherwise it was selected by the allotting commission. The applicable provisions are an Act of Congress of July 1, 1902, which was ratified by the Cherokee people on August 7, 1902, the provision being as follows:

"That the allotment thus to be made shall be selected by a duly appointed administrator or executor. If, however, such administrator or executor be not duly and expeditiously appointed, or fails to act promptly when appointed, or for any other cause such selection be not so made within a reasonable and proper time, the Dawes Commission shall designate the lands thus to be allotted."

These provisions can be found in the 32 U. S. Stat. at L., page 716. In accordance with a prevailing practice at the time, for the purpose of selecting the allotment, an administrator was appointed by the United States Court for the Northern District of the Indian Territory, sitting at Tahlequah. He selected the allotment, made final report to the court of having done so, and on August 27, 1906, that court made order, which, omitting caption, is as follows:

"Order of Court.

"And this cause coming on to be heard by the court upon the final report of the administrator and the report and recommendations of the master in chancery thereon, and the court being fully advised in the premises doth order and adjudge that said report of the master in chancery be, and the same is hereby approved.

"It is ordered that upon filing proper receipt from Taylor Eli for the certificates of decedent's allotment, or upon making proper proof that the same have been delivered to him, the administrator be discharged, his bondsmen released, and the estate closed upon the payment of costs.

"Done at a regular term of said court this Aug. 27, 1906.

"Luman F. Parker, U. S. Judge."

The inventory returned by such administrator was verified April 17, 1905, and filed April 20, 1905, and showed the entire property of decedent to be the E. ½ of the N. E. ¼ of section 8, twp. 28 N., R. 15 E., here in controversy, and N. W. ¼ of the S. E. ¼ of section 18, twp. 18 N., R. 24 E. The first tract is located in Nowata county, the second in Adair county. The administrator's final report, verified August 7, 1906, filed August 27, 1906, showed that the certificate of allotment had been delivered to

the heirs, and there was nothing further for the administrator to do. Order of final discharge was made October 22, 1908, by the county court of Cherokee county, the order, omitting caption, being as follows:

"Order of Final Discharge.

"Whereas, on the 27th day of August, 1906, Hon. Luman F. Parker, Judge of the United States Court for the Northern District of the Indian Territory, made an order discharging the above-named administrator, on the filing of the allotment certificates for the allotment of the said Nancy Eli, deceased, and whereas said administrator files on this day the deeds from the Cherokee Nation and the United States Government for the said allotment in this court,

"It is, therefore, adjudged, ordered, and decreed by the court that the said administrator be, and he is hereby discharged as administrator of said estate and his bond exonorated pursuant to the order hereinbefore referred to.

"Given under my hand this the 22nd day of October, 1908.

"J. T. Parks, County Judge."

The record that was before this court on the first appeal, case No. 17106 (126 Okla. 12, 257 P. 761), has been read in its entirety. Also the briefs have been read, and the opinion of the court deciding that case, which appears in the present case-made. It appears therefrom that the district court of Nowata county held that the conveyances that were approved by the county court of Cherokee county in 1924, relied on by the second grantees, Wilson and Tucker, were invalid, and that the conveyances approved prior thereto by the county court of Adair county were valid, and this court reversed its action and held that the proper court to approve a deed in this case was the county court of Cherokee county. The conveyances covered the land and the right to the extracted oil. The effect of that reversal was to change the title to the land, and along with it to create a liability of the oil operators, who had been operating the land since 1916, to account to the administrator of T. C. Wilson, deceased, and to R. E. Tucker, who were joined as parties along with the Indian heirs, Taylor Eli, James Eli, and Charlotte Chuculate, nee Muskrat, the record showing that the administrator and Tucker were the real parties in interest, the others nominal.

The case was remanded to the lower court for the accounting, which by agreement had been held in abeyance pending the time that this court passed upon the matters involved in the appeal. There were some applications for rehearing, and an application was made to the Supreme Court of the United States for certiorari to certify up the record and the case went there. That court, however, on final consideration, held that the way the case was presented there was no federal question in it that the court would review. The opinion in the case is found in the 72 L. Ed. 994, and is a memorandum decision, and is as follows:

"The Carter Oil Company, J. Wood Glass, T. A. Calvert et al., Petitioners, v. Taylor Eli, James Eli, Charlotte Chuculate, etc., et al. (No. 496.)

"On writ of certiorari to the Supreme Court of the State of Oklahoma.

"See same case below, 126 Okla. 12, 257 P. 761.

"Messrs. George S. Ramsay, Chester I. Long, James A. Veasey, L. G. Owen, Walter Davison, George E. Chamberlain, and Peter Q. Nyce for petitioners.

"Messrs. Daniel Haden Linebaugh, John Barry, Norman E. Reynolds, Paul C. Williams, and Paul Pinson for defendants.

"April 23, 1928. Per Curiam: Dismissed for want of a federal question, in that the decision of the state Supreme Court could be sustained, and was sustained on nonfederal grounds. Hammond v. Johnston, 142 U. S. 73, 78, 35 L. Ed. 941, 942, 12 Sup. Ct. Rep. 141; Eustis v. Bolles, 150 U. S. 366, 370, 37 L. Ed. 1111-1113, 14 Sup. Ct. Rep. 131; Bilby v. Stewart, 246 U. S. 255, 257, 62 L. Ed. 701, 702, 38 Sup. Ct. Rep. 264; New York ex rel. Doyle v. Atwell, 261 U. S. 590, 592, 67 L. Ed. 814, 815, 43 Sup. Ct. Rep. 410; George O. Richardson Machinery Co. v. Scott, No. 198, October term, 1927, opinion announced February 20, 1928 (276 U. S. 128, 72 L. Ed. 497, 48 Sup. Ct. Rep. 264.)"

Thus the court declined to interfere. The decisions relied upon for this opinion clearly demonstrate that, if possible to put the decision of the state court upon any ground other than a federal ground, duly relied on in the state court, the Supreme Court of the United States does not review. Its action left the decision of this court undisturbed.

The assigned reason of the opinion of the Supreme Court of Oklahoma was that the probate court of Cherokee county was the successor of the federal court, sitting at Tahlequah, and that as application had been made for letters of administration in the United States court prior to statehood, and letters of administration had been issued, that jurisdiction was thereby fixed in the

Cherokee ·county court to approve the deeds of the full-blood heirs to lands belonging to their ancestor that had been selected by the administrator.

The proceedings for the appointment of ,the administrator for the selection of the land are in part contained in the case-made. Pursuant to the orders of the United States court, the case was closed in the Cherokee county court, and the administrator discharged in October, 1908, and afterwards administration proceedings were had in Adair county, where deceased died. Prior to statehood, the Arkansas law was in force with reference to the appointments of administrators and executors. That law was in contemplation of Congress and the Cherokee people when they enacted the agreement of July 1, 1902. Under chapter 4, sec. 58, Indian Territory Statutes (Mansf. Dig. c. 1, sec. 1) which was adopted on the 2nd of May, 1890, the clerk of the court issued letters subject to confirmation by the court, if the court was not in session, and by section 59· (Mansf. Dig. c. 1, sec. 2) of that chapter it was provided that the letters should be granted in the court of the county in which the testate or intestate resided. Under sec-' tions 63, 64 (Mansf. Dig. c. 1, secs. 6, 7), of that chapter there were limitations as to who could apply for letters of administration, with various provisions as to forfeiting the rights to administration, and there are provisions in section 86 (Mansf. Dig. c. 1, sec. 29) for different kinds' of administration, one was with the will annexed and another was as administrator de bonis non (section 98, Indian Territory · Statutes). and another during minority or absence. and there were requirements as to filing an inventory, giving notice to creditors and provisions for handling the lands· and for the sale of personal estate, with a requirement for settlement by the end of three years. See Indian Territory Statutes, sections 58 to 280.

The. opinion rendered by this court on the former hearing, speaking through Justice Branson, was reported in the Pacific Reporter with a statement of the concurrences, as follows: Phelps, Lester, Riley, Hunt, Clark, and Hefner. JJ. Mason, V. C. J., dissented. The ninth Justice was unaccounted for. In the official reports there are no dissents, and the same concurrences, and the other Justices unaccounted for.

The administrator appointed by the United States court was not empowered to dispose of the land selected or to subject it in any manner to any claims, for the reason that the land was inalienable at that time, and descended directly to the heirs, and was not subject to administration in the fullest sense. The provision for approval is as follows:

"Provided, that no conveyance of any interest of any full-blood Indian heir in such land shall be valid, unless approved by the court having jurisdiction of the settlement of the estate of said deceased allottee." Act Cong. May 27, 1908, sec. 9 (35 Stat. 315).

As applied to the present case, it is clear that any jurisdiction that the United States court had over the settlement of the estate of the deceased allottee had by its own order long since passed before this act came into operation, the act being passed on the 27th of May, 1908, and becoming effective 60 days thereafter. Under the Oklahoma statute, in the event of the discharge of an administrator and the closing of the estate without full administration, there could be what is commonly known as an administrator de bonis non. See sections 6486 and 6487, Revised Laws 1910 [O. S. 1931, secs. 1381-1382]. There was an administrator appointed in Adair county after the administration was formally closed in Cherokee county in accordance with the order of the United States court. When that was done, there was no longer any jurisdiction in the county court of Cherokee county, as deceased never resided there and was a resident of the territory embraced in Adair county, in which part of her land was located, and there was no property in Cherokee county. Section 6193, Revised Laws 1910 [O. S. 1931, sec. 1069], which was in full operation, is imperative, and is in part as follows:

"6193. Venue of probate acts. Wills must be proved, and letters testamentary or of administration granted:

"First. In the county of which the decedent was a resident at the time .of his death. in whatever place he may have died."

Section 6195 [O. S. 1931, sec. 1071] is equally imperative as to the jurisdiction. Section 6197 [O. S. 1931, sec. 1087] was enacted while this matter was in the Adair county court.

Such was the view of everybody concerned in the matter. This view was held by the then county judge and subsequent county judges of Adair county, and it was held by the administrative office of the United States government having in charge the administration of Indian affairs. It·was so held and considered by the probate attorneys that were appointed at various times

to assist in protecting the rights of the Indians. It was evidently so considered by the attorneys that were engaged in examining abstracts for persons in due course of business, that were buying lands of this kind. The principle was declared in Burton v. Colley, 113 Okla. 265, 242 P. 185, in a guardianship case. In that case the court says:

"Therefore, the county court of Love county had jurisdiction of the guardianship of the estate of the plaintiff, and so long as this guardianship was pending, the jurisdiction of every other county court in the state to appoint a guardian for the plaintiff was excluded. DeWalt v. Cline, supra; Crosbie v. Brewer, supra; Baird v. England, 85 Okla. 276, 205 P. 1098; State ex rel. Monahawee v. Hazelwood, 81 Okla. 69, 196 P. 937; Parmenter v. Rowe, 87 Okla. 158, 200 P. 683.

"The county court acquiring jurisdiction of an Indian Territory guardianship, as successor to the United States court in the Indian Territory, exercises a jurisdiction clearly defined by the aforesaid constitutional provisions, and the Legislature recognized this jurisdiction, and beginning with the first session after statehood, enacted laws providing for the transfer of probate proceedings from one county court to another. (Sess. Laws 1907-08, pp. 205-212; Sess. Laws 1910, p. 37; secs. 6196-98, Rev. Laws, 1910.)

"If upon the creation of counties in that part of the state formerly comprising the Indian Territory, the domicile of the ward was in a county other than that to which his guardianship proceedings passed by virtue of the aforesaid constitutional provisions, the proper procedure was to transfer such proceeding to the county of his domicile, as provided by Sess. Laws 1907-8, supra, or by appropriate action of the court to which such proceeding passed, terminate that guardianship before jurisdiction of another court is sought."

The third subdivision of the syllabus is as follows:

"Where a county court of one county had acquired jurisdiction of the guardianship of a minor, as the successor of the United States court for the Southern district of the Indian Territory, and subsequently the county court of another county, the domicile of the minor, made an order appointing another guardian for said minor and ordered his real estate sold, and said real estate was sold to a purchaser in good faith, who relied upon the record of such court, such sale cannot be collaterally attacked on the ground of the exclusive jurisdiction of the first court, when nothing appears on the face of the record of the second court showing that the court acted without jurisdiction."

Acting on that assumption, and at a time when no other court was contending for jurisdiction, and at a time when the proceedings appeared to be regular, and the administration proceedings were actually pending in Adair county and nowhere else, a deed was procured from Taylor Eli, the father of the deceased allottee, which in due course was approved by the county court of Adair county. The language of the act in designating the court to approve is "having jurisdiction." It might be true that all that there was left for that court to do would be to approve a deed made by the heirs of the intestate. That, of course, was the settlement of the estate as near as any court could come to it. Everybody acted on the idea that the county court of Adair county was the proper court. No person dissented.

Under that view, a man by the name of Chesnut bought the interest of Taylor Eli in this land, and the conveyance was approved by the county court of Adair county, and later it was transferred to a man named Wilkerson, and then to Calvert and Glass, two of the defendants in this case. By other conveyances, approved by the county court of Adair county, Calvert and Glass succeeded to the title to all of the lands, subject to the oil and gas leases, under which the Carter Oil Company extracted the oil from the land beginning in the year 1916. The property had been bought in regular course, and there appears no evidence of any overreaching in dealing with the heirs and procuring the deeds.

In 1924, T. C. Wilson, an attorney, associated himself with R. E. Tucker, and bought the land from the heirs, and the conveyances were approved by the Cherokee county court. In the meantime, the amount of oil that had been produced amounted in value to approximately $300,000, and the oil had been divided, the royalty being paid to the heirs and to their grantees in accordance with the conveyances made by the heirs and approved by the county court of Adair county.

A great many questions are discussed in the briefs here. Some on estoppel, some on limitations, and a good deal is said about champerty, but it occurs to us that the question that is decisive is, whether or not the deeds approved by the county court of Cherokee county in the year 1924 were valid. From the standpoint of the knowledge of the grantees of the prior rights of the other parties, there can be no doubt

that they knew that the other parties had the first deeds from the heirs, and that the only ground that they could hope to prevail on was the fact that the first takers had their deed approved by the county court of Adair county, instead of the county court of Cherokee county.

It would appear that Congress used terms advisedly when it provided for an approval by a court that had jurisdiction of the settlement of the estate. In the year 1926, Congress, in view of a perplexing variety of decisions, saw fit to make other provisions on the subject, and while the provisions are not applicable as controlling here, being enacted after the original proceedings were had, they are persuasive as to what the legislative body had in mind in the Act of 1908, as construed by the Legislature itself. Reference is here had to the Act of April 12, 1926, 44 Stat. at L. 239, which amended section 9 of the Act of May 27, 1908, and the language used is that the death of any allottee of the Five Civilized Tribes shall operate to remove all restrictions upon the alienation of the allottee's land. One could scarcely argue that, though the word "shall" is used there, it meant to exclude those who had died theretofore from the operation of the statute. There Congress inserted a provision that the conveyance should not be valid unless "approved by the county court having jurisdiction of the settlement of the estate of the deceased allottee or testator," the words "county court" being inserted therein in lieu of the word "court," the words "having jurisdiction" being used just as in the former case. Evidently to be operative, the word "having" applies to the time when the approval is to be had, and is not limited to the county court having jurisdiction at the time of the passage of the act. Normally the county court in whose jurisdiction, measured territorially, the deceased had resided, would have the jurisdiction, as shown in the history of our decisions on the subject. The Act of April 12, 1926, is as follows:

"Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled, that section 9 of the Act of May 27, 1908 (Thirty-fifth Statutes at Large, page 312), entitled 'An Act for the removal of restrictions on part of the lands of allottees of the Five Civilized Tribes, and for other purposes,' be, and the same is hereby, amended to read as follows:

" 'Sec. 9. The death of any allottee of the Five Civilized Tribes, shall operate to remove all restrictions upon the alienation of said allottee's land: Provided, that hereafter no conveyance by any full-blood Indian of the Five Civilized Tribes of any interest in lands restricted by section 1 of this Act acquired by inheritance or devise from an allottee of such lands shall be valid unless approved by the county court having jurisdiction of the settlement of the estate of the deceased allottee or testator: Provided further, that if any member of the Five Civilized Tribes of one-half or more Indian blood shall die leaving issue surviving, born since March 4, 1906, the homestead of such deceased allottee shall remain inalienable, unless restrictions against alienation are removed therefrom by the Secretary of the Interior for the use and support of such issue, during their life or lives, until April 26, 1931; but if no such issue survive, then such allottee, if an adult, may dispose of his homestead by will free from restrictions; if this be not done, or in the event the issue hereinabove provided for die before April 26, 1931, the land shall then descend to the heirs, according to the laws of descent and distribution of the state of Oklahoma, free from all restrictions: Provided, that the word "issue" as used in this section shall be construed to mean child or children: Provided, further, that the provisions of section 23 of the Act of April 26, 1906, as amended by this act, are hereby made applicable to all wills executed under this section: And provided further, that all orders of the county court approving such conveyances of such land shall be in open court and shall be conclusive as to the jurisdiction of such court to approve such deed: Provided, that all conveyance by full-blood Indian heirs heretofore approved by the county courts shall be deemed and held to conclusively establish the jurisdiction of such courts to approve the same except where more than one such conveyance of the same interest in the same land has been made by the same Indian to different grantees and approved by county courts of different counties prior to the passage of this act, and except that this proviso shall not affect and may not be pleaded in any suit brought before the approval of this act.'

"Sec. 2. The statutes of limitations of the state of Oklahoma are hereby made and declared to be applicable to and shall have full force and effect against all restricted Indians of the Five Civilized Tribes, and against the heirs or grantees of any such Indians, and against all rights and causes of action heretofore accrued or hereafter accruing to any such Indians or their heirs or grantees, to the same extent and effect and in the same manner as in the case of any other citizen of the state of Oklahoma, and may be pleaded in bar of any action

brought by or on behalf of any such Indian, his or her heirs or grantees, either in his own behalf or by the government of the United States, or by any other party for his or her benefit, to the same extent as though such action were brought by or on behalf of any other citizen of said state: Provided, that no cause of action which heretofore shall have accrued to any such Indian shall be barred prior to the expiration of a period of two years from and after the approval of this act, even though the full statutory period of limitation shall already have run or shall expire during said two years' period, and any such restricted Indian, if competent to sue, or his guardian, or the United States in his behalf, may sue upon any such cause of action during such two years' period free from any bar of the statutes of limitations.

"Sec. 3. Any one or more of the parties to a suit in the United States courts in the state of Oklahoma or in the state courts of Oklahoma to which a restricted member of the Five Civilized Tribes in Oklahoma, or the restricted heirs or grantees of such Indian are parties, as plaintiff, defendant, or intervener, and claiming or entitled to claim title to or an interest in lands allotted to a citizen of the Five Civilized Tribes or the proceeds, issues, rents, and profits derived from the same, may serve written notice of the pendency of such suit upon the Superintendent for the Five Civilized Tribes, and the United States may appear in said cause within 20 days thereafter, or within such extended time as the trial court in its discretion may permit, and after such appearance or the expiration of said 20 days or any extension thereof the proceedings and judgment in said cause shall bind the United States and the parties thereto to the same extent as though no Indian land or question were involved. Duplicate original of the notice shall be filed with the clerk of the court in which the action is pending and the notice shall be served on the Superintendent for the Five Civilized Tribes, or, in case of his absence from his principal office, upon one of his assistants, and shall be served within ten days after the general appearance in the case of the party who causes the notice to be issued. The notice shall be accompanied by a certified copy of all pleadings on file in the suit at the time of the filing of the duplicate original notice with the clerk and shall be signed by the party to the action or his or her counsel of record and shall be served by the United States marshal and due return of service made thereon, showing date of receipt and service of notice. If notice is not served within the time herein specified, or if return of service thereof be not made within the time allowed by law for the return of service of summons, alias notices may be given until service and return of notice is

had and in no event shall the United States be bound unless written notice is had as herein specified: Provided, that within 20 days after the service of such notice on the Superintendent for the Five Civilized Tribes or within such extended time as the trial court in its discretion may permit the United States may be, and hereby is, given the right to remove any such suit pending in a state court to the United States district court by filing in such suit in the state court a petition for the removal of such suit into the said United States district court, to be held in the district where such suit is pending, together with the certified copy of the pleadings in such suit served on the Superintendent for the Five Civilized Tribes as hereinbefore provided. It shall then be the duty of the state court to accept such petition and proceed no further in said suit. The said copy shall be entered in the said district court of the United States within 20 days after the filing of the petition for removal and the defendants and interveners in said suit shall within 20 days thereafter plead, answer, or demur to the declaration or complaint in said cause, and the cause shall then proceed in the same manner as if it had been originally commenced in said district court, and such court is hereby given jurisdiction to hear and determine said suit, and its judgment may be reviewed by certiorari, appeal, or writ of error in like manner as if the suit had been originally brought in said district court."

Evidently the national Legislature, in enacting the same, had in mind cases similar in some aspects to this one, probably Baird v. England, 85 Okla. 276, 205 P. 1098, and cases cited therein, and the case of Oklahoma Oil Co. v. Bartlett, 236 Fed. 488, because it provided that henceforth all of the orders of the county court, approving such conveyances, should be in open court, and should be conclusive as to the jurisdiction of the court to approve the deed, with a proviso, however, that conveyances theretofore made and approved by the county courts should conclusively establish the jurisdiction of such courts, except where there had been two conveyances approved by county courts of different counties, prior to the passage of this act, and further that the last proviso of section 1 should not affect and might not be pleaded in any suit brought before the approval of the act. The suit in question had been brought in 1924. However, there is one of the suits, that is involved here in which complaint is made, that was brought later. It is the one charging that the conveyances relied upon by Wilson and his associate were void, and obtained by overreaching, but it is not necessary to discuss that further, in view of

what the admitted facts are in this case. Evidently the provision about notifying the United States authorities was operative on the accounting as made in the district court.

Briefs on behalf of the parties have been filed in this case by Taylor Eli, James Eli, Charlotte Chuculate, T. P. Wilson, administrator of the estate of T. C. Wilson, deceased, G. A. Wilson, Fannie C. Wilson, and R. E. Tucker, plaintiffs in error, against the Carter Oil Company, J. Wood Glass, F. A. Calvert, Louella P. Chesnutt, and Tidal Oil Company, defendants in error.

The journal entry of judgment shows that on the entry of the judgment now appealed from, Messrs. Linebaugh & Pinson, Reynolds & Williams, and John Barry, represented R. E. Tucker and the Wilsons, and that L. G. Owen represented the Carter Oil Company, and the Tidal Oil Company was represented by W. P. McGinnis, and that Glass and Calvert appeared for themselves.

A motion was filed in this court on the 27th of August, 1932, signed by Messrs. D. H. Linebaugh, Reynolds & Williams,. and John Barry, to dismiss the appeal of plaintiffs in error in No. 20110, which appears to be this case, and the cross-appeals in No. 19818, 164 Okla. 302, 23 P. (2d) 1011, in which the appellants are Taylor Eli, James Eli, Charlotte Chuculate, T. P. Wilson, administrator of the estate of T. C. Wilson, deceased, G. A. Wilson, Fannie C. Wilson, and R. E. Tucker, and a brief has been filed in support thereof, it being stated at page 28 as follows:

"In conclusion, we respectfully suggest that the principal reason for this motion to dismiss is that we may direct the court's attention to its opinion in Lone Star Gas Co. v. Parsons, et al., 159 Okla. 52, 14 P. (2d) 369,—the opinion being filed June 28, 1932— and the principle announced in that case."

The case has been examined, but it is not applicable. The ground relied upon for dismissal is based on the fact that the appeal in this case is an attempt to impeach the final judgment, order, and decree of this court in case No. 17106, and discussion is had of some of the cases relied on originally.

As applied to the trial judge in the present case, it was his duty to carry out the mandate of this court. However, it is claimed by the parties whose appeals · are sought to be dismissed that he did not do so. An inspection of the record is convincing that there is ground for the contention that he did not carry out the mandate of this court. Under that mandate some of

the appellants would have been compelled to have accounted to the original plaintiffs for more than the amounts allowed.

A review of some of the authorities cited in the original brief of the appellants, whose appeals the appellees now desire to dismiss, are Wade v. Hope & Killingsworth, 89 Okla. 64, 213 P. 549, and Powell v. United M. & M. Co., 107 Okla. 170, 231 P. 307, and several more are cited and commented on. The trial judge did not follow the mandate and the case should not be dismissed on motion. The motion to dismiss is accordingly denied.

As disclosed by this record, the deeds that Wilson and his associate relied upon were void, not being approved by the court then having jurisdiction of the settlement of the estate of the dead allottee, and if their title failed, they were not in a position to attack the title of the others. The question has been briefed here by the Carter Oil Company and Calvert and Glass and Louella Chesnutt and Tidal Oil Company on the one side in this case. Similar briefs have been filed in case No. 19818. The counter briefs of Taylor Eli, James Eli, and Charlotte Chuculate are in No. 19818, but we have examined them in view of the fact that No. 19818 is an appeal by nearly all of the parties to the case. Taylor Eli, James Eli, and Charlotte Chuculate are dissatisfied because under the rulings as against them, Wilson, administrator of T. C. Wilson, deceased, and his associates and R. E. Tucker will get all that there is, if the accounting made by the trial court is allowed to stand. Wilson, as administrator, is dissatisfied because under the accounting the portion coming to T. C. Wilson is to stand the repayment to Calvert and Glass of what they paid for the land, and the Tidal Oil Company and Louella Chesnutt are also complaining because of the accounting, and appear to have briefs in No. 19818. Carter Oil Company is dissatisfied, though it is not held accountable for the bulk of the oil extracted by it, for the assigned reason that the United States government is the one to sue for the oil extracted prior to the Wilson deeds.

In case No. 19818, the same parties that have prosecuted this appeal, No. 20110, are cross-petitioners, so that if this case is decided and the original case is held to have been rightly decided, an accounting passes out of the case. We are confronted with the position, taken by the original defendant, that the former decision of this court, reversing the first case, was unjust and er-.

roneous and should not be followed. If the jurisdiction in the Cherokee county court was lacking, that decision should not stand. The jurisdiction to approve the deeds relied on was in the Adair county court, and there appears no fraud or overreaching in the acquisition of the titles relied on by the original defendants. The question arises as to whether or not that decision should be allowed to stand under the doctrine of the "law of the case." Numerous decisions there are wherein the courts have refused to review decisions on former appeals, under the rule that the doctrine of the "law of the case" forbids. However, as applied to the present case, this is a Supreme Court reviewing on a second appeal the action of the lower court that did not follow its mandate, and according to a well-recognized exception to the rule, in case of gross injustice, the rule will not be applied so as to perpetuate injustice. Clearly, two wrongs should not be committed, but the first wrong should be remedied. It would be a misnomer to say this court has no right to undo a wrong and do what is right. By the laws of mathematics, the addition of two negatives will not make a positive, and by the law of morals, two wrongs added will not make a right. There are several cases cited from this court in which it is so stated, and among others those hereinafter specifically referred to. Among others is Wade v. Hope & Killingsworth, 89 Okla. 64, 213 P. 549, where the second subdivision of the syllabus is as follows:

"The courts uniformly hold that an appellate court may review and reverse its former decision in the same case where it is satisfied that gross or manifest injustice has been done by its former decision, or where the mischief to be cured far outweighs any injury that may be done in the particular case by overruling a prior decision."

The case of Powell v. United Mining & Milling Co., 107 Okla. 170, 231 P. 307, expresses the doctrine in the first section of the syllabus, as follows:

"Where the judgment of a lower court has been reversed by this court upon an appeal by proceedings in error and the case remanded to the lower court for a new trial, the lower court, upon the second trial, is required to follow, as the law of the case, the judgment of this court therein rendered. On a second appeal in said case to this court, the decision of this court and rules of law by it announced in its opinion on the first appeal constitute the law of the case as to all points decided in the first opinion, but this is not a cast-iron rule incapable of re-

laxation in any event. On a second appeal to this court, it may review and reverse its former decision in the same case, where it is satisfied that gross or manifest injustice has been done by its former decision, and will do so where the mischief to be cured far outweighs any injury that may be done in the particular case by overruling a prior decision, and especially where the party benefiting from the erroneous judgment, and in full reliance thereon, has not surrendered substantial and valuable rights which cannot be restored by the court."

In the case of George v. Connecticut Fire Ins. Co., 84 Okla. 172, 200 P. 544, the court expresses the doctrine as follows:

"While the general rule is that the question decided by the Supreme Court on the former appeal becomes the law in the case in all its stages, and will not, ordinarily, be reversed on second appeal where the facts are the same, this court, in the case of Oklahoma City Electric Gas & Power Co. v. Baumhoff, 21 Okla. 503, 96 P. 758, stated:

" 'The courts uniformly hold that an appellate court may review and reverse its former decision in the same case where it is satisfied that gross or manifest injustice has been done by its former decision, or where the mischief to be cured far outweighs any injury that may be done in the particular case by overruling a prior decision'."

One of the leading cases in this state on the subject of county expenses and county indebtedness carries an illustration of the recognition by the court of its duty to rectify a wrong that has been made in its former decision, in a different case between the parties, by reversing its former erroneous decision. There were two of the appeals. In the first one of the cases the sheriff, who had been compelled to keep his prisoners during the latter part of the fiscal year, the estimate having been expended and there being no funds to pay for keeping the prisoners, kept them notwithstanding. He presented his bill to the county commissioners, but not being authorized under the statute to allow the same, it was rejected. He proceeded then to go into the county court, which appears to have had jurisdiction, and the county court rendered judgment in his favor for the amount that was owing for keeping the prisoners. The county commissioners appealed to this court. The next year the same thing happened as to keeping prisoners. Instead of going into the county court, he went into the district court, and in that court his claim was repudiated and the sheriff took the appeal, so that this court had before it at the same time, between the

same parties, the same legal question involved in two separate appeals.

The court reached the appeal that the county commissioners had made first, and proceeded to reverse the county court and disallow the claim. This was followed by a motion for rehearing, which in turn was disallowed, and also by a second application for rehearing, which was disallowed. Some time after this a full court reached the appeal that the sheriff had taken from the district court. The case was argued, and in an opinion by Justice Hardy the law point was determined the other way. In the meantime the mandate had gone down, but in view of the fact that the judgment secured by the sheriff had been reversed by this court, there was nothing left in the county court except the payment of costs when the decision in the second appeal was decided.

The result of the entire matter, however, was that after the appeal in the second case had been decided, a third application was made in the original case, which was No. 7464 in this court (Board of Com'rs of Craig County v. Smartt), the opinion in which was published in 158 Pac. 601, and which was withdrawn in an opinion by Chief Justice Owen, which can be found at page 159 of the 75th Oklahoma Report, and which being short is here quoted in full:

"OWEN, C. J. The question presented in this case is identical with that presented in Smartt v. Board of County Commissioners (No. 7737) 67 Okla. 141, 169 P. 1101, L. R. A. 1918C, 313. On authority of that case, the petition for rehearing will be granted, the opinion filed May 16, 1916 (published in 158 Pac. 601, L. R. A. 1916F, 892). withdrawn and the judgment of the lower court affirmed.

"RAINEY, PITCHFORD, McNEILL, and HIGGINS, JJ., concur. SHARP, J., dissents."

This opinion was filed the 15th of July, 1919. The opinion that was withdrawn was filed on the 16th of May, 1916. The original judgment was affirmed and a second mandate so showing was sent to the court.

Other courts have had similar questions before them and have reasoned upon the matter, and for that reason we quote extensively from the opinion of the Kansas Supreme Court in the case of Henry v. A., T. & S. F. Ry. Co., 28 L. R. A. (N. S.) page 1088. wherein the reason for correcting mistakes is given, as follows:

"The appellant contends that, as the testimony on which the judgment in question

rests was exactly the same as upon the earlier trial, the decision on the former appeal necessarily determines the result of this appeal, and requires judgment in its favor. If it be assumed that no new elements were brought into the case on the second trial, it does not follow that the former decision, right or wrong, is conclusively binding upon this appeal. Ordinarily, a question considered and decided on the first appeal is deemed to be settled, and, except for very cogent reasons involving palpable error, will not be re-examined on a second appeal. Some courts hold that a decision, whether right or wrong, is conclusive in all subsequent appeals, but what is called the 'law of the case' is not an inflexible rule which requires a court to blindly reiterate a rule of law that is clearly erroneous. In Central Branch Union P. R. Co. v. Shoup, 28 Kan. 394, 42 Am. Rep. 163, the court after stating generally the importance of stability and uniformity in the interpretation of the law, said: 'We do not understand that the rule that a decision once made becomes the established law of the case is a cast-iron rule, and incapable of relaxation in any event. Cases may arise in which it will be very clear that the first decision was erroneous; that not only in the case at bar will wrong result from adhering to the decision, but also other interests through the state will be imperiled; hence we do not doubt the power of the court to reconsider and reverse a prior decision in the same case.' In the late case of Missouri, K. & T. R. Co. v. Merrill, 65 Kan. 436, 59 L. R. A. 711, 93 Am. St. Rep 287, 70 Pac 358, it was insisted that a ruling on the first appeal, however incorrect, was conclusive on the second, but the court again refused to sanction the theory that it was required to readopt and repeat a decision founded in serious error. Mr. Justice Smith answered the contention that a decision once announced by the Supreme Court must be adhered to, by saying: 'This would come to us with more force if we were not now considering the same case with the same parties before the court. If an erroneous decision has been made, it ought to be corrected speedily, especially when it can be done before the litigation in which the error has been committed has terminated finally. We are fully satisfied that the rule of the former case is shattered by the pressing weight of opposing authority, and that reason is against it.' In Ellison v. Georgia R. & Bkg. Co., 87 Ga. 691, 13 S. E. 809, the learned Chief Justice Bleckley used the following forcible language: 'Some courts live by correcting the errors of others and adhering to their own. * * * Minor errors, even if quite obvious, or important errors, if their existence be fairly doubtful, may be adhered to and repeated indefinitely, but the only treatment for a great and glaring error, affecting the current administra-

tion of justice in all courts of original jurisdiction, is to correct it. When an error of this magnitude, and which moves in so wide an orbit, competes with truth in the struggle for existence, the maxim for a Supreme Court, supreme in the majesty of duty as well as in the majesty of power, is not stare decisis, but fiat justitia, ruat coelum'."

In Brewer v. Browning, L. R. A. 1918F, page 1185, the Mississippi Supreme Court had occasion to refer to the law of the case doctrine and to distinguish the idea of res adjudicata as applied to a Supreme Court on the second appeal. That court, in reviewing other authorities, says:

"We think courts are created and maintained and sworn to administer justice, and not to adhere strictly to arbitrary rules. When a rule of decision defeats justice or seriously impairs it, it should be departed from rather than followed. Rules are made to secure justice, not defeat it. We think the rule of 'the law of the case' is a good rule of practice, and should be followed, except in rare cases where the decision is manifestly and palpably erroneous, and to follow it would result in grave injustice being done."

And upon a suggestion of error, we find the following:

"We do not think the language used in our opinion: 'When judicial construction is out of harmony with natural justice the judicial reasoning should withstand the most careful scrutiny and analysis before it should prevail,' and 'the courts are created, maintained, and sworn to administer justice and not to adhere strictly to arbitrary rules. When a rule or decision defeats justice or seriously impairs it, it should be departed from rather than followed,' is such radical language as need frighten the members of the bar. There may be those who love consistency of utterance and of precedent more than they do the administration of justice, but in our opinion the courts were created solely for the purpose of administering justice. We recognize that precedents are valuable guides, and it is not our purpose to throw them aside entirely, and to proceed and blaze a new trail from our personal sense of right and justice. The decisions of the courts are not necessarily unchangeable, and it is the duty of the court to change a decision, if wrong in principle, and which leads to injustice and wrong."

As applied to the facts in this case, we have this situation: The defendants in the original case, and their respective grantors, had bought one-half of the land from the full-blood Indian heir, and had paid for it all that it was worth, so far as this record shows, at the time of the purchase. Oil was later discovered, and the barren blackjack hill with some rocky land at its base became very valuable for oil. One of the parties owning a one-fourth interest at that time was a minor, and an oil and gas lease was made which was approved by the county court of Adair county, where the minor lived and where guardianship was taken out. One of the heirs owning one-fourth interest became of age about that time, and an oil and gas lease was made by that full-blood heir, which was approved by the county court of Adair county. Some years before this, the half interest that belonged to the father had by heirs been sold, under the supervision of the probate court of Adair county, in the territory of which court the ancestor had died prior to statehood. That proceeding was apparently regular, and the county court approved that deed. About eight years after the leases had been made and the oil had been discovered and a large part of it extracted, an attorney by the name of Wilson, in connection with a man by the name of Tucker, succeeded in getting from the heirs a deed for a half interest in the property as his fee for recovering the other half. Shortly thereafter, his associate bought the other half, though the grantors had more than three years prior thereto sold their interest in the property, and executed deeds with the approval of said court, said court exercising jurisdiction upon the ground of it being the court of the county in which the authority existed for the settlement of the estate of the deceased, and while no other court was claiming any jurisdiction of the matter. All heirs were of full age when they executed their deeds. At said time there was no proceeding pending elsewhere looking to the settlement of the estate.

About 16 years before this, an administrator had been appointed in the United States Court for the Northern District of the Indian Territory for the purpose of selecting an allotment, but that administrator had been ordered to be discharged by the court appointing him, and the estate had been closed by formal order in the year 1908 in Cherokee county by the county court, the successor of the United States court. Sometime afterwards, application had been made to the county court of Adair county for letters of administration over the estate, evidently with a view of establishing heirship, to be followed later by one of the heirs who was an adult and desired to sell, disposing of his part. No party in interest appears to have objected to the

order of discharge. As there was no administration pending elsewhere at the time of the application in Adair county, and as Adair county was the forum for the administration on the estate of the deceased, by reason of residence at the time of death, and also the location of the land therein as required by the 1910 laws, we are unable to see that there were any valid legal objections to the authority of the Adair county court to approve the deeds relied on by the defendants in the case. If authority is needed to show loss of jurisdiction in the Cherokee county court, the case of Otero v. Otero et al., 90 P. 601, decided by the Supreme Court of Arizona, would be instructive. We are unable to see any valid reason for reversing the judgment of the lower court in the first instance, when the facts are considered as they existed and as shown by the record.

The brief of the plaintiff in error in this case discusses champerty, and some other points, but we do not think it essential to go into that, in view of the fact that the original claimants, by purchase of the land, were in undisputed possession, under deeds that we think were valid, when the suit was started. The briefs that have been submitted are lengthy, and in them there is complaint of a great many things that we do not deem it necessary to discuss, in view of the finding on the main branch of the case. The judge of the lower court endeavored to follow the ruling of the higher court on the former appeal on the accounting in some respects, all of which is complained of practically by all the parties concerned in the various cross-appeals that are found in No. 19818.

Under the above considerations, it is not necessary to inquire as to whether the action of the lower court, appealed from, in making the accounting, follows with accuracy the decision of this court or correct principles, as the foundation for its action fails. Its action on the accounting is in all things therefore reversed. The opinion rendered on the former appeal and reported in 126 Okla. 12, 257 P. 761, is overruled and withdrawn, and the decisions therein rendered, set aside, and the case as originally decided in the district court of Nowata county, being No. 5204, and brought here by proceeding in error in case No. 17016, is in all things affirmed, and the entire costs of both appeals and in the court below will be taxed to the plaintiffs, Taylor Eli, James Eli, Charlotte Chuculate, T. P. Wilson, administrator of the estate of T. C. Wilson,

and to R. E. Tucker. The costs accruing since G. A. Wilson and Fannie C. Wilson were made parties will be taxed to G. A. Wilson and Fannie C. Wilson and the others named above.

HEFNER, SWINDALL, and McNEILL, JJ., and BELL, Special J., concur. LESTER, C. J., CLARK, V. C. J., and YOUNG, Special J., dissent. RILEY, J., not participating. CULLISON and ANDREWS, JJ., disqualified.

———

HEFNER, J. (concurring). This is the second appeal in this case. Eli v. Carter Oil Co., 126 Okla. 12, 257 P. 761. When the case was here on the first appeal, I concurred in the original opinion. On a study of the application for rehearing, when the case was here before, I came to the conclusion that a rehearing should be granted and that an opinion should be written which affirmed the judgment of the trial court. I so advised some or all of the Justices who were then members of the court.

In my judgment that opinion is clearly wrong.

The land was allotted by an administrator of the deceased allottee, who had been appointed in the Northern District of the Indian Territory, and on the advent of statehood the administration proceedings were regularly transferred to the county court of Cherokee county. The estate was definitely and finally closed, and the administrator discharged by the county court of Cherokee county on the 22nd day of October, 1908. That order is as follows:

"Whereas, on the 27th day of August, 1906, Hon. Luman F. Parker, Judge of the United States Court for the Northern District of the Indian Territory, made an order discharging the above-named administrator, on the filing of the allotment certificates for the allotment of the said Nancy Eli, deceased, and whereas said administrator files on this day the deeds from the Cherokee Nation and the United States government for the said allotment in this court,

"It is, therefore, adjudged, ordered, and decreed by the court that the said administrator be, and he is hereby discharged, as administrator of said estate, and his bond exonerated pursuant to the order hereinbefore referred to.

"Given under my hand this the 22nd day of October, 1908."

On the advent of statehood, both Cherokee and Adair counties, as well as other

counties, were carved out of the territory formerly in the Northern District of the Indian Territory, and the allottee died in that territory which became Adair county. In my judgment, when the county court of Cherokee county closed the estate and discharged the administrator, the jurisdiction of that court was completely ended. In other words, after the discharge of the administrator, there were no administration proceedings pending anywhere, and, if, for any reason, it became necessary in the future to have an administrator appointed for the estate of deceased allottee, the proper county in which application should have been made for the appointment of such administrator would have been Adair county, the county in which the deceased allottee resided at the time of his death.

Shortly after the administration had been definitely and finally closed and the administrator had been discharged in Cherokee county, an application was made for the appointment of an administrator in the county court of Adair county. A year or so after that appointment, deeds were taken from the full-blood heirs of the deceased allottee, and such deeds were approved by the county court of Adair county. As pointed out in the opinion of the court, it was necessary that these deeds be approved by the county court having jurisdiction of the settlement of the estate of the deceased allottee. When these deeds were taken, the administration proceedings were, and had for quite a while prior thereto been, pending in the county court of Adair county. It is my judgment that, at the time the application was made for the appointment of the administrator, the county court of Adair county had full and complete jurisdiction to make the appointment, and was in fact the proper court to make it. Under our statutes, the county court of Adair county had full jurisdiction to appoint administrators.

After the deeds had been regularly and properly approved by the county court of Adair county, oil and gas leases were purchased by certain of the defendants, possession of the property was taken, wells were drilled, and two or three hundred thousand dollars worth of oil had been produced from the premises, and settlement therefor was made in accordance with the deeds which had been approved by the Adair county court. Several years after the deeds under which defendants claim had been taken and approved by the county court of Adair county, and after the oil, both the royalty and working interest, had been sold and set-

tlement made therefor, plaintiffs took deeds, for and upon a consideration of about $750 for both the land and the oil and gas that had been produced, from the same grantors who had executed the deeds, several years prior thereto, under which the defendants claim, and which deeds had been regularly approved by the county court of Adair county and under which the land had been developed for oil and gas purposes. Plaintiffs caused the deeds which they took to be approved by the county court of Cherokee county, and then brought suit against the defendants to recover the land and for an accounting for the oil produced therefrom. The trial court, after the case had been thoroughly presented to it, held that the county court of Adair county was the proper court to approve the deeds, and that the county court of Cherokee county had no jurisdiction to make the approval, and rendered judgment for the defendants. Under the facts presented by this record, it is my judgment that the district court was correct in so holding.

Even if the administration proceedings in the county court of Cherokee county had never been closed and were still pending at the time the administrator was appointed by the county court of Adair county—which is not the case— and the appointment of the administrator by the county court of Adair county was regular, and nothing appeared in the record to show a want of jurisdiction, and the deeds were approved by that court, and the defendants acted and relied upon that record and that appointment and were innocent purchasers under their deeds, then, under the doctrine announced by this court in the case of Burton v. Colley, 113 Okla. 265, 242 P. 185, the plaintiffs could not recover, for the reason that it would be a collateral attack upon the appointment of the administrator by the county court of Adair county, and, under the rule announced in that case, the collateral attack cannot thus be made. The third paragraph of the syllabus is as follows:

"Where a county court of one county had acquired jurisdiction of the guardianship of a minor, as the successor of the United State Court for the Southern District of the Indian Territory, and subsequently the county court of another county, the domicile of the minor, made an order appointing another guardian for said minor and ordered his real estate sold, and said real estate was sold to a purchaser in good faith, who relied upon the record of such court, such sale cannot be collaterally attacked on the ground of the exclusive jurisdiction of the

first court, when nothing appears on the face of the record of the second court showing that the court acted without jurisdiction."

It is true that the Burton Case was one in guardianship. There can be no difference in principle between the appointment of a guardian and the appointment of an administrator. The rule in the guardianship case is clearly applicable to an administration proceeding, and the rule announced in that case should be followed herein if the facts in the case at bar were such as to make the rule applicable. However, the facts here are not such as will make that rule applicable, for the reason that the administrator had been discharged and the administration closed by the county court of Cherokee county before the administrator was appointed by the county court of Adair county.

We are not confronted by the question of whether we are now bound by the former judgment. However, after careful study, in my judgment, the facts disclosed by this record clearly bring this case within the rule announced by this court in the case of Powell v. United Mining & Milling Co., 107 Okla. 170, 231 P. 307, and announced as the law of this case in paragraph 1 of the syllabus written by Mr. Justice KORNEGAY.

---

BELL, Special J. (concurring). I concur in the opinion of the majority of the members of the court, by reason of the result, although I am not in complete accord with the manner of the statement of the law therein declared. I deem the original decision of this court on appeal erroneous, and am convinced that the plaintiffs should not be permitted to acquire and retain title to this land. The doctrine of "law of the case" is somewhat disturbing, and is not to be lightly regarded; yet it presents no insurmountable barrier, when a court has been lead into grave error. The legal question involved is a difficult one, and as I read the respective briefs, and recall the trend of the oral argument, I am convinced that both sides are in serious doubt as to the correctness of their position as to the law. I do not regard the action of the Supreme Court of the United States in declining to review the former opinion of this court as tantamount to an affirmance thereof, and I fully realize the importance of termination of litigation when each party has had his day in court. But the same parties appearing in the former appeal are again before us. and such being the case, we are con-

fronted with the duty of overruling and reversing the former opinion; and, such would be our moral duty, even though the United States Supreme Court might be said to have affirmed the decision we now overrule.

Such action may to many seem drastic, and to a degree presumptuous, but courts are instituted for the promotion of justice between litigants, rather than for the purpose of establishing and enhancing the reputation for their members for legal and judicial acumen; and this court is by no means the first court, nor will it be the last court, to adopt similar views. Wm. H. Seward, Secretary of State in President Lincoln's Cabinet, once said, "There is a higher law than the Constitution"; in other words, it is the true policy of all courts, this one included, to mete out justice in a particular case, where at all possible, be the consequences what they may.

When confronted with a situation such as presents itself here, where plaintiffs have so carefully mapped out and chartered their course, and fortified themselves with "adjective law" in a manner bidding defiance to the "substantive law," and in conflict with all true conception of equity, a court should remember the God to whom its official oath is addressed, and his eternal commandments, and measure out justice according to its conception of Divine command, which is always superior to any secular authority:

"For this commandment, which I command thee this day, It is not hidden from thee: Neither is it far off. It is not in heaven, that thou shouldest say,—Who shall go up to heaven for us and bring it unto us, that we may hear it and do it? Neither is it beyond the sea, that thou shouldest say, —Who shall go over the sea for us and bring it unto us that we may hear it and do it? But the word is very nigh unto thee, in thy mouth and in thy heart, that thou mayest do it." Deut. 30: 11-14, inc.

And Sir William Blackstone, in his Commentaries, defines (municipal) law as "a rule of civil conduct, prescribed by the supreme power of a state, commanding what is right, and prohibiting what is wrong."

In his dissenting opinion, Justice Young comments on the tendency of the white man to overreach the Indian. Unfortunately, this comment is amply justified by history. However, the Indians have been manipulated out of this case by plaintiff; and the trial court has enjoined them from any further complaint; and so we must conclude that

the sentiment of the plaintiff toward the Indians is expressed in this brief nursery rhyme:

"There lay on the banks of the River Nile,
A very considerate crocodile,
His face took on a look of woe,
And his tears fell fast in the stream below.
'I'm mourning,' he said, 'the untimely fate,
'Of the dear little fish, which I just now
ate'."

And were we to adhere to the former opinion of this court, the Indians would be in no better position than they now are.

From its inception, the action and purpose of plaintiffs has not been at all commendable, and equity forbids that they should prevail. The prospect of equally dividing some $300,000 is most alluring, and failure of realization is naturally disappointing; and again we find a passage from Holy Writ, applicable, but hardly consoling to plaintiff, in Jer. 13:22:

"And if thou sayest in thine heart, wherefore cometh these things upon me? For the greatness of thine iniquity are thy skirts discovered, and thy heels made bare."

For the reasons above given. I concur in the opinion of the majority.

---

McNEILL, J. (specially concurring). I desire to express some of my individual views which were not set forth in the majority opinion. An examination of the record in the case of Taylor Eli et al. v. Carter Oil Company, No. 17106 (126 Okla. 12, 257 P. 761), shows that an amended petition was filed in the district court in case No. 5205, wherein T. C. Wilson was made a party plaintiff, entitled "Taylor Eli, James Eli, Charlotte Chuculate, nee Muskrat, nee Eli, and T. C. Wilson, Plaintiffs." Said plaintiffs alleged that they were jointly the owners of and entitled to the possession of the east half of the northeast quarter of section eight (8), township twenty-eight (28) north, range fifteen (15) east, situated in Nowata county.

Plaintiffs show deraignment of their title and aver that by reason of same they are jointly and generally the legal and equitable owners of the whole of said land. Plaintiffs further show by mesne conveyances how the Carter Oil Company acquired its rights in and to the oil and gas mining leases covering said premises, and the manner, and the interests acquired by the defendants Calvert and Glass in the premises, and aver that all of the conveyances by which said defendants assert their rights are null and

void, and pray in the first cause of action for the cancellation of the deeds, rights, and claims asserted by Louella P. Chesnutt, and of all deeds, rights, and claims asserted by the defendants F. C. Calvert and J. Wood Glass, and cancellation of all claims and rights, and muniments of title purporting to convey unto the Carter Oil Company any interest in and to the oil and gas rights pertaining to the aforesaid land, save and except the guardian's lease executed upon the part of the plaintiff James Eli, on account of which, by mesne conveyances, the Carter Oil Company claims and asserts ownership and rights.

In their second cause of action, they claim damages in the sum of $299,631.03, for the wrongful extraction of oil from said premises, alleging that the said Carter Oil Company unlawfully extracted 90,658.78 barrels of oil subsequent to July 3, 1916, until and inclusive of December, 1917; that the highest market price of aforesaid oil during the unlawful conversion extending over the period aforesaid was the sum of $3.25 per barrel, but that since December, 1917, said company has continued and is continuing to unlawfully produce, extract, and dispose of said oil from said premises, the total amount of which is unknown to the plaintiffs, and the plaintiffs pray that an accounting for the full value of oil and gas extracted from the premises be awarded to plaintiffs, save and except the offset due and allowable to defendants for royalty paid to two of plaintiffs above mentioned.

In their third cause of action, they allege that by virtue of the foregoing facts they are the legal and equitable owners of the lands above described, and entitled to the immediate possession thereof; that defendants deny the plaintiffs' right in and to the whole or any part of said premises save and except for the fact that the Carter Oil Company holds a valid and subsisting lease upon one-fourth interest in and to said premises, and denies the plaintiffs' right, title, and interest in and to the aforesaid land. In their general prayer, the plaintiffs pray judgment awarding possession of the fee and three-fourths interest in and to the oil and gas rights of said premises and for any and all other relief which to the court seems equitable and proper.

The defendant Carter Oil Company denies the plaintiffs' right of assertion of the right of possession to said premises, setting forth in detail the proceedings by which it obtained its title to said leased premises, and

asserting that the county court of Adair county assumed and took complete jurisdiction over the estate of Nancy Eli, deceased, from and after November 17, 1908, and has had complete and exclusive jurisdiction of said estate ever since statehood, and was the only court having jurisdiction to hear and pass upon petitions for the approval of deeds or conveyances executed by the plaintiffs of the full-blood Indian heirs of Nancy Eli, deceased.

Said defendant further avers that it, in good faith, went into possession of said land, more than seven years prior to the time petition herein was filed, and began to operate said land under its said oil and gas mining leases; that it had no notice whatever of the claims now asserted by plaintiffs until their aforesaid petition was filed; that all of the wells drilled by this defendant were necessary in order to prevent drainage of said land of its oil and gas deposits by reason of the production of oil and gas on adjoining lands.

That it had made large expenditures in good faith in its operating said lands for oil and gas with the full knowledge of the plaintiffs, and that it had paid the royalties accruing to Charlotte Chuculate, nee Muskrat, and the guardian of the said James Eli, under this lease and the same were accepted and retained without any warning to said defendants that the plaintiffs claimed any interest in the leased premises adverse to the rights of said defendant; that said plaintiffs stood by and permitted said defendant to make said expenditures for over a period of more than seven years without asserting any claim, right, or interest in the premises adverse to said defendant; that the plaintiffs have been guilty of laches in asserting their claim, if any they have, and by their conduct have estopped themselves from now asserting them.

In its cross-petition, the defendant Carter Oil Company prayed that plaintiffs' petition be dismissed; that the defendant R. E. Tucker be made a party to the suit, and be required to set forth the nature of his claim to an interest in the land, and that said defendant have judgment upon its cross-petition against the plaintiffs and each of them and against said Tucker, adjudging the defendant to be the owner of good, valid, and subsisting leases on the said premises and the title and validity of same be confirmed against the plaintiffs in favor of defendants.

The defendants Glass and Calvert set forth the various proceedings, showing how they acquired their title and interest in said premises, and in their cross-petition against the plaintiffs, and R. E. Tucker, they pray for the cancellation of the instruments in favor of plaintiff Wilson and defendant R. E. Tucker, whereby said Wilson and Tucker claim title and interest in said premises, and pray that such conveyances be held for naught and the quieting of the title of said defendants Glass and Calvert, in and to said premises against the plaintiffs and against said defendant Tucker, and all persons, claiming under them adverse to the title of the defendants Glass and Calvert.

In the opening statement of the case, the plaintiff Wilson said, in part:

"May it please the court, this action is for a threefold purpose, being instituted by Taylor Eli, James Eli, Charlotte Chuculate, nee Muskrat, nee Eli, and T. C. Wilson, against the defendants the Carter Oil Company, a corporation, J. Wood Glass, F. A. Calvert, Louella P. Chesnutt, and R. E. Tucker.

"The plaintiffs ask for quieting title; that is the principal and primary object of the action; second, for an accounting for the oil and gas taken from the premises; and third, that they be let into possession.

"They ask to be awarded the entire fee, but we admit that the Carter Oil Company holds a valid and subsisting lease on one-fourth interest in the same, executed by the guardian, covering the interest of the plaintiff James Eli. The primary purpose of the action is for cancellation of the evidence of title claimed by the defendants. The facts in the case are as follows: * * *

"The defendants admit they have been in operation and are now in possession of the lands and taking the oil and gas. We claim we are entitled to an accounting at the highest market value since they went upon the premises and began the sale of oil. I presume those matters will wait in the court upon that question, and, of course, as ancillary we are entitled to be let into possession of the entire fee, and subject only to the defendants' right under the operation of the lease by virtue of this guardianship matter."

From this record it is my view that this is an action in equity; that the gravamen of the issues was the quieting of the title to the premises either in the plaintiffs or in the defendant. The plaintiffs ask for the cancellation of the instruments of conveyance, whereby said defendants claim their rights, title, and interest in and to said premises. The defendants in their answer

ask for the same relief. The accounting and the question of possession were incidental to the real issues involved. If this conclusion is correct, we are met at the threshold of this case with the question of whether or not plaintiffs filed their suit under the equitable doctrine of coming into court with clean hands. If they did not institute their action with clean hands, a court of equity will not come to their assistance, but will leave them where it finds them. It is apparent from this record that the proceedings instituted by Wilson and Tucker did not savor of wholesome litigation. It was apparent to them that an action in court was necessary, after the deeds were obtained, to secure to them any rights under said deeds. There is no question of the good faith in the procuring of the deeds and leases by said defendants, nor in the operation and expenditure of the money made by the defendant Carter Oil Company in the production and development of the leases on the premises.

The defendants' contentions presented in their brief were as follows:

"(a) There were no administrative proceedings of any sort pending in the Cherokee county court when the instruments upon which the defendants rely were approved by the county court of Adair county, and the latter court had jurisdiction.

"The jurisdiction of the Cherokee county court was acquired in a special way through the provisions of the Enabling Act and when after statehood such proceedings were fully terminated and closed. Thereafter, by virtue of the Constitution and the statutes of Oklahoma, the Adair county court was the only court having jurisdiction of the settlement of the estate."

"The instruments under which the defendants claim having been approved by the Adair county court during the years 1911 to 1921, long after the final termination of the proceeding in the Cherokee court, were valid and the deeds to Wilson and Tucker which were approved by the Cherokee county court in the fall of 1924 were void.

"(b) The United States having approved of all, and in some instances, having supervised the transactions of the defendants, in acquiring conveyances from the full-blood Indian heirs, and having advised the defendants that their deeds were valid and the defendants having relied thereon, would be estopped to maintain this action, and on such account, the plaintiffs are estopped.

"(c) The defendants at the time of the approval of the deeds under which they claim, in good faith thought that the county court of Adair county had jurisdiction of the settlement of the estate of Nancy Eli, and, in any event, they will be protected against the inequitable claims of the plaintiffs by the principle announced in Burton v. Colley, 113 Okla. 265, 242 P. 185.

"(d) Plaintiffs Wilson and Tucker formed a conspiracy, the object of which was to rake up an old claim for a purpose speculative agreeing together to bring suit thereon and divide the spoils in case of success, and in so doing violated principles of the common law which render their deeds void, and violated a criminal statute which prohibits an attorney at law from buying claims with intent to bring suit thereon, which likewise rendered the deeds void.

"(e) The demands of the plaintiffs, under the facts in the case, are stale, inequitable and unconscionable."

Both plaintiffs and defendants claim title through a common source of title, to wit, the allotment of Nancy Eli, deceased, who died intestate without issue on or about November 1, 1903, being at the time of her death a resident of that portion of Indian Territory now known as Adair county, Okla. There is no dispute as to the heirs of said decedent; Taylor Eli, the father of said decedent, inherited an undivided one-half interest in said allotment; James Eli, her brother, and Charlotte Chuculate, nee Muskrat, nee Eli, her maternal half-sister, each inherited an undivided one-fourth interest in same, each of whom was duly enrolled upon the approved rolls of the Cherokee Nation as full-blood Indians.

It appears that the plaintiff James Eli, according to the enrollment records, was one year of age on November 25, 1901, and that, on November 25, 1921, he became 21 years of age. Letters of guardianship were issued over his estate. On May 5, 1916, his guardian filed a petition in the county court of Adair county, Okla., praying for permission and authority from said court to sell a lease for oil and gas mining purposes upon said minors one-fourth interest in said land. On May 10, 1916, the county court of said county authorized said guardian to lease the interest of said minor, and on May 18, 1916, an oil and gas lease was sold at public auction to Boesche et al. for a cash bonus of $2,200. The county court of Adair county approved and confirmed said sale and lease, and the same was thereafter, on May 20, 1916, filed of record in the office of the county clerk of Nowata county. On May 29, 1916, said defendant Carter Oil Company became the owner of

said oil and gas mining lease. Thereafter, on the 1st day of June, 1916, the plaintiff, Charlotte Chuculate executed an oil and gas mining lease for the same consideration to Boesche, one of the lessees in the aforesaid minor lease, which lease was approved by the county court of Adair county on the 1st day of June, 1916, and filed for record with the county clerk of Nowata county on June 2, 1916, and thereafter on June 9, 1916, said lessee transferred and assigned said lease to the Carter Oil Company, which assignment was filed for record in the office of the county clerk of Nowata county on June 10, 1916. On June 30, 1916, the plaintiff Taylor Eli executed a warranty deed, covering his interest in and to said premises to one Robert Pollock, and thereafter, on May 29, 1916, the Carter Oil Company, through mesne conveyances, acquired an oil and gas lease on said interest, which lease was filed for record in the office of the county clerk of Nowata county on May 29, 1916.

The following constitutes the source of title of the plaintiff Wilson and the defendant R. E. Tucker:

On September 24, 1924, James Eli made a contract and conveyance to said T. C. Wilson of one-eighth interest in and to the east half of the northeast quarter of section 8, township 28, north of range 15 east, Nowata county. Said instrument also granted, conveyed, and assigned unto the said Wilson, his heirs, and assigns as follows:

"The E. ½ of the N. E. ¼ of section 8, township 28, north, range 15 east, Nowata county, Okla., free, clear, and discharged of and from all former liens, grants, and incumbrances of whatsoever nature, and I do hereby grant, convey, and assign unto him, party of the second part, his heirs, and assigns, a one-half interest in and to all royalties arising from the extraction and removal of oil and gas therefrom and in and to all damages arising therefrom, and in and to all damages of whatsoever nature arising from any injury, or in any wise pertaining to the fee and in and to all oil and gas rights thereunto pertaining, or in any wise connected, and all choses of action involved in the same and all damages and things of value pertaining to the property and arising from the proceeds thereof hereunto accrued or accruing pendente lite. And be it herein agreed and by these presents known that the within and foregoing obligation and assignments and liens are in no wise contingent, and shall in no wise be affected by any subsequent conveyance, liens, incumbrances, or assignments of any nature whatsoever, made or entered into by and on behalf of the party of the first part, his heirs, or assigns."

This instrument was approved by the county court on the 4th of August, 1924, and filed for record in the office of the county clerk of Nowata county on October 18, 1924. The said Wilson also obtained a contract of conveyance from Taylor Eli, which provided for the retaining of said Wilson as attorney for the said Taylor Eli relative to the recovery of any interest in and to the allotment of Nancy Eli, deceased, on behalf of said Taylor Eli and the recovery of all moneys, damages, and things of value arising from the taking of oil and gas therefrom heretofore accrued or accruing pendente lite, which instrument conveyed to the said Wilson a one-fourth undivided interest in and to said premises and one-half interest in and to all damages arising from the extraction or removal of oil and gas therefrom. This instrument was dated the 17th of September, 1924, and approved by the county judge of Cherokee county on the 22nd of September, 1924. It was filed for record in the office of the county clerk of Nowata county on October 18, 1924. A similar contract and conveyance was obtained by said Wilson from Charlotte Chuculate. This instrument was approved by the county judge of Cherokee county October 4, 1924, and filed in the office of the county clerk of Nowata county on October 18, 1924.

It thus appears from the foregoing instruments executed to said Wilson that the same were received by him in consideration of his services in connection with the allotment of Nancy Eli, deceased. There is no evidence that any other consideration was given for said contracts and conveyances.

It also appears from the record that the said R. E. Tucker obtained a quitclaim deed from Taylor Eli, James Eli, and Charlotte Chuculate, née Muskrat, covering the aforesaid premises, subject only to the rights and interests heretofore granted to said T. C. Wilson, which quitclaim deed was dated November 21, 1924, and approved by the county court of Cherokee county on November 21, 1924. This instrument recites a consideration of $750. It is to be observed that the deed taken by said Tucker was procured subsequent to the filing of the original petition in said cause No. 5204, which was commenced in the district court of Nowata county on October 18, 1924.

On the appearance docket of Adair county, the following entry appears.

"1924

"September 25, to certified copies

"(T. C. Wilson of Pryor) 4.00 Pd. by R. E. Tucker

"10-3-24 4.00."

Counsel for defendants contend that Wilson and Tucker knew of the deeds which had been approved by the Adair county court before they took their deeds, and which were approved by the Cherokee county court, and with full knowledge that, when they took these conveyances, their grantors were not in possession of said premises, and that it would be necessary to bring a suit for the possession of the lands or an accounting of the oil and gas produced therefrom. It is my opinion that this record fully justifies this contention. Wilson was called as a witness on behalf of the defendants, and testified that he was a member of the bar of this state, and knew at the time he took the deeds that his grantors were not in possession of the land. He also testified as follows:

"Q. You knew that other parties had been in possession of the land for many years, didn't you? A. I assumed that; I don't know that I knew it positively. Q. You knew that you would have to bring a lawsuit in order to get possession under these deeds, didn't you? A. I didn't know any such things; I anticipated that probably I would. Q. You anticipated it and you expected to bring a lawsuit at the time you took the deeds, didn't you? A. Well, I don't know that I did. My previous answer expresses my attitude in it entirely, at that time. Q. You did bring this suit or cause it to be brought, without demanding possession from any of the defendants in this action, didn't you? A. Yes, sir, I made no personal demand of any one. * * * Q. How long have you been acquainted with Mr. Tucker? A. I have known Mr. Tucker three or four or five years, I guess. * * * Q. You had an understanding or an agreement with him, at or a short time after you got these deeds, with reference to bringing this suit, didn't you? A. The Witness: I can't say that I did, Mr. Rosser. Q. Mr. Tucker furnished money to you to get these contracts and to pay the costs of bringing this suit, didn't he? A. No, sir, he didn't furnish any money to bring this suit. Q. Did he furnish any money to make the deal with the Indians? A. Mr. Tucker may have loaned me some money—But I went on that trip. Q. You had an understanding with him about the matter before you went on that trip, didn't you? A. I had some understanding with Mr. Tucker, yes."

Counsel for plaintiffs contend that the statutes relating to champerty are not being applicable to restricted Indian lands. However, section 1678, C. O. S. 1921 [O. S. 1931, sec. 1938] provides as follows:

"Any person who takes any conveyance of any lands or tenements, or of any interest or estate therein, from any person not being in the possession thereof, while such lands or tenements are the subject of controversy, by suit in any court, knowing the pendency of such suit, and that the grantor was not in possession of such lands or tenements, is guilty of a misdemeanor."

This section applies to the defendant Tucker. If Wilson and Tucker entered into an agreement or conspiracy for the purpose of stirring or raking up this alleged claim or right of said Indians, for their own legitimate purposes and instituting litigation thereon whereby they were to receive the primary benefit therefrom, then this section applies with equal force to both.

In this case, at the most, it may be assumed, although it is not altogether conclusive, that Tucker paid $750 as consideration for the quitclaim deed executed to him. This land had been producing oil since 1916. At the time of the trial the oil runs amounted to practically $300,000, and even though certain sections of our champerty statutes might not be applicable to restricted Indian lands, this fact could not assist plaintiffs in a court of equity on the question of coming into court with clean hands. It is apparent to me, from a review of this record, that the procedure followed by plaintiff Wilson and defendant Tucker, was for a common purpose of disturbing the title to property by parties who had remained in possession since 1916, and for their own ultimate benefit, and that it was not for or on behalf of their grantors, the Indians. Defendant Tucker did not appear as a witness in the trial of said case.

In the case of Casserleigh v. Wood, 119 Fed. 308, the court said:

"In view of these considerations it is difficult to resist the conviction that Casserleigh's purpose in entering into the contract was not to aid a poor and helpless litigant in the prosecution of a claim which he believed to be meritorious, but that his real object was to take advantage of a flaw in another's title for his own benefit; or, in other words, to gamble in litigation. The contract shows that he was to receive by far the greater part of the money or property which might be recovered if an action was brought and successfully prosecuted, and

that he intended to profit more largely by the suit than the person whom he ostensibly befriended. We think, therefore, that it might well be held that the contract in question is voidable under the Colorado statute of maintenance, within the construction which has been placed on the statute by the local courts, because it appears from the provisions of the contract and the allegations of the bill that Casserleigh, by promising to produce evidence which was deemed absolutely essential to a recovery, and by engaging to bear the costs of litigation, induced the bringing of a suit concerning a subject-matter in which he had no interest whatever; and that he did so for his own benefit, hoping to derive a large profit from money invested in maintaining a lawsuit. Most any one would permit an action to be brought in his name under the favorable conditions on which the appellant proposed to bring a suit against the owners of the Emma mine, and it may well be that the action would not have been brought but for his active efforts in that behalf and promise of assistance."

In reference to the defense that the demands of the plaintiff under the facts in the case, are stale, inequitable and unconscionable, I think this case should largely be governed by the rule announced in the case of Crosbie v. Partridge, 85 Okla. 186, 205 P. 758, wherein the court stated as follows:

"Statutes of the United States providing for allotment of Indian lands and patents, with restrictions upon alienation, were enacted to protect Indians from schemes and fraudulent practices of white men, not to aid in the unconscionable and inequitable enforcement of stale claims, to the injury of innocent parties who, in good faith, for value, and by regular procedure, have purchased allotted Indian lands through the Interior Department of the United States."

In the case at bar the United States government acquiesced in, consented to, and approved the proceedings by which the defendants obtained their title. The doctrine of estoppel is applicable in the instant case to the United States government and to its wards.

It is my view, apart from the holding of the majority opinion, that plaintiffs should have been estopped to institute their action on the theory that they did not come into a court of equity with clean hands.

---

YOUNG, Special J. (dissenting). Grave considerations of public policy as well as sound and well-settled legal principles, it seems to me, require that this court not disturb the opinion delivered in this case on April 19, 1927, and reported in 126 Okla. 12, 257 P. 761.

This is a second appeal in this cause to this court from judgments of the district court of Nowata county. The case as originally instituted was an action in that court by Taylor Eli, James Eli, and Charlotte Chuculate, full-blood Cherokee Indians, against the Carter Oil Company, J. Wood Glass, F. A. Calvert, and Luella P. Chestnutt. The petition presented in separate counts, actions in ejectment, to quiet title, and for an accounting for rents and profits. The land involved is the allotment of Nancy Eli, a full-blood Cherokee Indian who died in 1903 and before the allotment was made. Selection of the allotment was made for the heirs, the plaintiffs below, by an administrator appointed for the purpose by the United States District Court for the Northern District of Indian Territory. The administration proceeding was pending in the said United States District Court sitting in probate at Tahlequah, in what afterwards became Cherokee county, upon the advent of statehood, November 16, 1907. By the Enabling Act, and the Schedule to the Constitution of Oklahoma, jurisdiction over the cause was transferred to the district court of Cherokee county, and that court, by an order entered November 20, 1907 (four days after statehood), transferred the cause to the county court of Cherokee county, where it pended until October 22, 1908, when by an order entered in due course the cause was closed and Andy Dick, the administrator, finally discharged. The sole function discharged by the administrator and the sole purpose for which he was appointed appears to have been the selection of an allotment for the heirs of the decedent. It does not appear that Nancy Eli ever owned any estate of any kind anywhere other than the inchoate right to an apportionment from the tribal lands of the Cherokees.

Nancy Eli lived and died in that part of Indian Territory which was then embraced in the Northern District and which thereafter becameAdair county, Okla. The lands allotted to her heirs as aforesaid were restricted as to alienation by a congressional proviso that no conveyance of title thereto by them should be valid "unless approved by the court having jurisdiction of the settlement of the estate of said deceased allottee."

Defendants and their privies below assert title to the land through conveyances from the Indian heirs approved by the county

court of Adair county. Prior to the filing of the suit and when defendants were in possession under such claim of title, the Indian plaintiffs employed F. C. Wilson, an attorney at law, duly licensed as such, to prosecute an action for the recovery of the land and for rents and profits upon a contingent fee basis, agreeing to convey and conveying to him by deeds and assignments in proper form an undivided one-half interest in all moneys and property that might be recovered. These conveyances were duly approved by the county court of Cherokee county. Soon after the suit was filed, the Indians by further assignments and conveyances in proper form conveyed all their remaining interest in the property in suit to one R. E. Tucker for a cash consideration of $750. These instruments were also duly approved by the county court of Cherokee county. After the suit was filed, on motion of some of the defendants, Wilson, the plaintiff's attorney, and Tucker, their grantee, were by order of court joined as parties plaintiff. F. C. Wilson died while this suit has been pending in the courts and his interests are now revived in the name of his appropriate legal representatives.

When the cause was originally called for trial, it was agreed that the causes of action involving title to the land, viz., in ejectment, and to quiet title, should be first tried to a conclusion and the trial of the cause of action for an accounting reserved until the title was settled. Title to the land depended, under the facts which are nowhere seriously disputed, primarily upon one question, viz., whether jurisdiction to approve deeds of full-blood Indian heirs of Nancy Eli was vested in the county court of Cherokee county or in the county court of Adair county.

The first judgment of the trial court was for the defendants. Upon the first appeal to this court that judgment was reversed in an opinion which appears from the record to have been in all respects duly and regularly entered by this court without a dissenting vote. The former opinion which appears in full as Eli et al. v. Carter Oil Co. et al., supra, held that jurisdiction to approve conveyances of full-blood Indian heirs to the Nancy Eli allotment was lodged in the county court of Cherokee county; that defendants' muniments of title were void, and that plaintiffs and their grantees were entitled to recover.

By expressly conceding and pleading the conclusiveness and finality of the former decision of this court, defendants appealed to the Supreme Court of the United States by certiorari, where on hearing the matter, the appeal was dismissed. Carter Oil Co. et al., Petitioner, v. Taylor Eli et al., No. 496, 72 L. Ed. 994. Upon denial of certiorari by the Supreme Court of the United States, three petitions for rehearing were heard and considered by this court and overruled. Thereupon this court issued its mandate to the trial court, which, omitting the formal parts, stated:

"Now, therefore, you are hereby commanded to cause such reversal to show of record in your court and to issue such process and to take such other and further action as may be in accord with right and justice and said opinion."

This mandate was duly transmitted to the trial court and by it spread of record.

The trial court in the proceedings from which the instant appeal was lodged, construed that mandate of this court as precluding a re-examination by it of any question touching the validity of the deeds under which plaintiffs asserted title to the land. At page 132 of the case-made appears a motion for leave to file supplemental answer and amendment to original answer and cross-petition, filed by the Carter Oil Company. At page 277 appears a similar motion by defendants Glass and Calvert. Among other defenses which the defendants sought to inject into the controversy were the following:

"That at the original trial of this case, the defendants attempted to prove that Taylor Eli had in such manner been appointed such administrator; that in proof thereof, it offered in evidence a certified copy of the appearance docket in case No. 301 in the county court of Adair county, Okla., in the matter of the estate of Nancy Eli, which appearance docket purported to state that on November 17, 1908, an order had been entered by said court appointing said administrator as alleged; that at the time said certified copy was offered in evidence, the plaintiffs objected thereto and such objection was overruled to which the plaintiffs excepted and such certified copy was admitted in evidence; that near the close of the trial the plaintiffs renewed their objection to said evidence (quoting the language of counsel) 'for the reason that it is incompetent, irrelevant, immaterial, and inadmissible and the orders of court cannot be established by entries upon an appearance docket; such entries have no probative force and effect whatsoever.'

"That thereupon the court sustained such objection, saying: 'The Court: Gentlemen, it looks to me like the objection is good. That

294

is not the proper way to establish it. The objection will be sustained.'

"Thereupon the defendants took an exception. That this defendant avers that upon another trial of this case, it is informed and believes and alleges the fact to be that it will be able to and will furnish competent proof showing such appointment, and that at all the times when the instruments upon which this defendant relies were approved by the county court of Adair county, Taylor Eli was the duly appointed, qualified, and acting administrator of said estate and said administration proceeding was pending in said Adair county court."

The defendants further sought to inject into the controversy another defense as follows:

"That prior to the time of the bringing of this suit, the said T. C. Wilson, deceased, an attorney at law duly licensed to practice law in all the courts of this state, and R. E. Tucker, as this defendant believes and alleges the fact to be, had formed a conspiracy, the object of which was to rake up an old claim for a purpose purely speculative agreeing together to bring suit thereon and divide the spoils in case of success and in so doing violated a criminal statute of the state of Oklahoma which prohibits an attorney at law from buying claims with intent to bring suit thereon, such statute being section 1686 of the Comp. Stats of Oklahoma of 1921; that at the time Wilson took his conveyances from the Indian plaintiffs, alleged upon in the amended petition, he had an agreement with the plaintiff, Tucker, as this defendant believes and alleges the fact to be, whereby Wilson and Tucker were to finally acquire in full the alleged claims of the Indian heirs to the land involved and all rights incidental thereto; that at the time the trial started, this defendant had no knowledge of the matters alleged in this paragraph and its original answer and cross-petition contains no reference thereto; that upon the trial of this cause it first learned of the matters herein alleged; that because the deeds procured by Wilson and Tucker from the Indian heirs had their inception in the violation of the criminal statute, they are wholly void and the said Wilson and Tucker and those claiming under them are not entitled to any relief herein." ·

The disposition made of these applications for permission to file amended pleadings appears at page 503 of the case-made as follows:

"Mr. Barry: We ask the court to rule upon the applications of the defendants for permission to file amended pleadings.

"The Court: The court is of the opinion at this time that the decision of the Supreme Court which was rendered in this case is conclusive as against the separate defense that the former adjudication so far as this court is concerned is res judicata."

Again at page 548 in the journal entry of judgment made by the trial court September 12, 1928, the trial court recites:

"The court further finds that by virtue of the decision of the Supreme Court of the state of Oklahoma upon the appeal heretofore had herein the deeds under which the defendants Glass and Calvert claimed, are void and the oil and gas mining leases under which the Carter Oil Company and Tidal Oil Company claim are void except that the lease executed upon the undivided one-fourth interest inherited by James Eli under which the Carter Oil Company and Tidal Oil Company claim, is in all respects valid and existing and the validity thereof has not been questioned herein, but all parties have at all times conceded the same to be valid and it is ordered that said deeds and said oil and gas mining leases with the exception of the James Eli lease be and the same hereby are canceled and held for naught and the title of the plaintiff, T. P. Wilson, administrator of the estate of T. C. Wilson, deceased, and R. E. Tucker, is quieted as against all claims of Glass and Calvert, the Carter Oil Company and Tidal Oil Company in and to said land except as to the valid lease formerly held by the Carter Oil Company and now by Tidal Oil Company covering the undivided one-fourth interest in said land inherited by plaintiff, James Eli, and that the improvements, equipment, machinery, and appliances installed, erected or constructed upon said land for the purposes of developing the same and producing oil therefrom, is vested in the said T. P. Wilson, administrator of the estate of T. C. Wilson, deceased, and R. C. Tucker, subject only to the one-fourth interest of the Tidal Oil Company, and the Carter Oil Company and all other defendants are hereby enjoined and restrained from removing, altering, damaging, or destroying any of said property, equipment, machinery, and appliances that are now upon said property or which have been placed upon said property and charged against the said property as an item of cost or production, to which rulings the defendants, the Carter Oil Company, Tidal Oil Company, and Glass and Calvert, each except."

It will thus be seen that the judgment of the trial court, so far as the title to the land was concerned, was entered expressly in accordance with the mandate. And so far as title to the land is concerned, this appeal is an attempt by the defendants to appeal from a judgment on the former mandate.

At the outset it thus appears that this court is now confronted with the question of

the finality of the former judgment. Since the former appeal there has also been injected into this cause certain collateral matters affecting title, which, as the record stands, must also be noted. These grow primarily out of an application presented to the trial court in this cause by Wilson and Tucker for injunctive relief against the defendants herein, their Indian coplaintiffs, and Sams and Raymond, attorneys at law of Nowata.

The record discloses that just three days before the final mandate was issued from this court after the Supreme Court of the United States had denied certiorari, the Indian plaintiffs in this cause were taken to the office of Sams and Raymond, attorneys, of Nowata, Okla., where they executed a contract under the terms of which they purported to employ Sams and Raymond to bring suit against Wilson and Tucker to set aside the contract by which Wilson was employed as attorney for the Indians and the Tucker deeds.

The Sams and Raymond petition so filed, charged, in effect, that Wilson had procured the signature of his Indian clients to the attorney's contract and conveyance by false and fraudulent representations concerning the nature of the instruments; that Wilson and Tucker had been secretly engaged in a conspiracy to defraud the Indians; that the consideration for Tucker's deed was grossly inadequate and that the consideration was not in fact paid. Upon these grounds they sought to have Wilson's contract of employment as attorney and the Tucker deed adjudged void and canceled. Upon the filing of that action by Sams and Raymond, Wilson and Tucker in the case at bar filed in this cause their application for injunction to enjoin prosecution of the suit by Sams and Raymond upon the ground that such suit was being prosecuted for the benefit of the defendants in this suit, and that the defendants herein had conspired with Sams and Raymond to have such action filed so that the judgment and mandate heretofore entered in this case could not be enforced.

In view of the nature of the charges made in the application for an injunction, the manner in which the Sams and Raymond suit originated deserves careful scrutiny. Particularly is the manner in which Sams and Raymond obtained employment from Wilson's Indian clients of interest, since in their petition they make allegations, which the whole evidence without contradiction abundantly demonstrates are false and unfounded, to the effect that Wilson, another attorney, now deceased, had been guilty of conspiracy, had faith and fraud in procuring employment by the same Indians.

E. E. Sams, who personally seems to have handled the entire litigation for his firm on behalf of the Indians, was himself called as a witness for the plaintiffs in support of their motion for an injunction. He testified that a George Anderson, whom he thought lived at Tulsa, but was not certain, called him by 'phone and talked about bringing the Indians into Sams' office; that he did not know where George Anderson was talking from; that he first got acquainted with the Indians when they appeared at his office with an interpreter and told him their story; that their interpreter was John Bunch and that George Anderson was along. Asked whether the contract of employment was approved by the county court, Sams replied that it was. "The matter was handled by Mr. W. A. Woodruff, of Stilwell, an attorney," Sams testified, stating further that neither he nor Mr. Raymond was present in the county court when the contract was approved and he did not know whether the Indians were present or not. Sams further testified that he rather assumed that George Anderson paid the expense of having these Indians come to see him; that he knew George Anderson paid some of the hotel bills or meals or something of that kind. Sams, on being asked specifically whether he had any conference with a bank officials at Stilwell about the Indians' expenses, testified that the Indians had to have a little expense money in order to come to see him with reference to the case, and that "I rather think that I told the banker that I would see that that was paid." He said he did not have any recollection as to the amount of his guaranty, but that his recollection shows that it was something like $100, but would say positively that it was less than $150 all told. Asked whether he guaranteed the payment of certain notes at the bank, he replied:

"I didn't have anything to do with making the notes, this was an after consideration. I didn't even know for sure that the bank had furnished the money for them to come up here at the time they came up."

At page 207 of the case-made, the following appears:

"Q. Mr. Sams, what interest, if you know, did George Anderson have in this matter? A. None that I know of. Q. Sir? A. None that I know of."

Anderson remains to the record the mysterious stranger who instigated the Sams and Raymond suit at a strategic point in the history of the case at bar.

The Indians were not produced as witnesses at the trial by Sams and Raymond, who purported to represent them, nor is any reason apparent why they were not. The Indians testified by deposition in favor of Wilson and Tucker who placed their evidence in the record. When such depositions were offered in evidence, Sams interposed an objection to the introduction of the testimony of the very clients he purported to represent. In their testimony, the Indians, admitting they had signed the Sams and Raymond contract, stated that immediately upon signing the contract, they had "scattered out;" that they had not appeared before the county court to have the contract approved and did not know that suit had been filed.

One of the grounds upon which Sams and Raymond seek to have Wilson's contract vacated is that the attorney's fees provided by it are excessive. Yet the record discloses that Sams and Raymond took a contract providing a similar fee of 50 per cent. to themselves.

It is difficult to see what benefit the Indians could derive from the Sams and Raymond lawsuit. If, as they insist, Wilson had no authority to represent the Indians in the first instance and obtained a contract to do so by fraud, obviously, they could not repudiate his employment and at the same time claim the benefit of the long court flight he had made to establish their interest in an inheritance. The only real beneficiaries of the Sams and Raymond suit, if it succeeded, would be the defendants herein. The trial court denied an injunction solely upon the ground that Sams claimed he could not get one of the Indians in court, and did not want to put part on the stand unless all were there.

If the evidence was not sufficient to support the charge that the Sams and Raymond suit was instigated by the defendants herein to obstruct the mandate in this case, standing as it does, wholly uncontradicted, it is certainly sufficient to taint these new proceedings with grave suspicion. Champerty and maintenance—the inciting of groundless litigation—if established by the record, are equally to be condemned whether committed by one litigant or the other.

With reference to the validity of the Wilson and Tucker deeds, the trial court found as follows:

"The Court: The court finds, from the evidence adduced in this case, that there is no evidence of any nature tending to establish any fraud, and, inasmuch as the court has by its judgment decreed and found that the instruments were executed in good faith, now holds that the said instruments and each of them pertaining to the respective rights of Wilson and Tucker were executed in good faith."

In my opinion, under the evidence, this finding by the trial court is not only correct, but no other could properly have been made.

It should be further judicially noted that since the former opinion of this court, a bitter political fight was made upon former Chief Justice Fred P. Branson who wrote that opinion; that the correctness of that opinion was made a campaign issue; that Mr. Justice Andrews, elected in that campaign, when this case was reached on the docket, quite properly promptly certified his disqualifications.

Defendants Carter Oil Company et al. assert herein that the Indian plaintiffs are being defrauded by Wilson, their attorney, and Tucker, their second grantee; that the consideration paid for the deeds approved in Cherokee county was grossly inadequate and seek to avail themselves of this defense to bolster up their own title.

Turning to the question of the effect of the former opinion and judgment herein, it appears to me that the correctness of the former judgment of this court is not properly before us for review. Every question of either fact or law on the question of title was before the court on the former appeal and then decided. A careful examination of the record and the opinion in that case and the majority opinions herein will show no material fact overlooked in the former opinion and no controlling legal proposition not considered.

This is an effort to appeal from a judgment on a mandate so far as title to the land is concerned. The right to appeal from a judgment of the trial court upon a mandate of this court necessarily assumes that the trial court possesses jurisdiction to review the mandate; otherwise, there is nothing from which an appeal may be taken. If this should be conceded as the law, there would be engrafted into the judicial machinery of this state a perpetual motion

contraption that will permit contrary litigants with plenty of money to keep the courts grinding on their lawsuits forever. All petitions for rehearing on the former appeal were heard and denied. No proceedings to set aside the judgment have been filed in the trial court. Neither a direct nor a collateral attack upon the former judgment of this court has been instituted. Only briefs arguing its invalidity are before us. If final judgments may be attacked and set aside in the fashion attempted here, no decision in the reports is beyond attack, and the security of all titles and property rights vested by court decrees in former years, is imperiled.

I regard no rule of law founded on sounder grounds nor more firmly established than that announced by this court in Hill v. Hill, 71 Okla. 312, 178 P. 94, as follows:

"An appeal will not be entertained by this court from a judgment and decree entered in the district or another inferior court, in exact accordance with the mandate of this court upon a previous appeal."

Supporting the decision, many authorities are cited, among them Oklahoma Gas & Electric Co. v. Baumhoff, 21 Okla. 503, 96 P. 758, which case is the leading case in this state for the rule announced in the Hill Case, and has been cited and approved to the rule in no less than 28 cases by this court in former years. (See Shepard's Oklahoma Citations; Hill v. Hill, 71 Okla. 312, 178 P 94.)

In Thomas v. Thomas, 27 Okla. 784, 109 P. 825, 113 P. 1058, 35 L. R. A. (N. S.) 124, this court in the syllabus held:

"Where, after a decision of a case and rendition of an opinion in this court, its mandate is regularly transmitted to the trial court, and is spread upon its records, this court, in the absence of fraud, accident, inadvertence, or mistake, is without jurisdiction to recall the mandate and entertain a petition for rehearing, and a motion for leave to file the same will be denied."

And in the body of the opinion this court said:

"One of the best-considered cases confirming our view on this subject is that of Ott v. Boring, 131 Wis. 472, 110 N. W. 824, 111 N. W. 833, 11 A. & E. Ann. Cas. 857, in which that court, citing a larger number of state and federal authorities, said:

" 'The question of the period of jurisdiction of purely appellate courts is a somewhat intangible one, and not to be decided always upon the same principles and considerations as those which regulate the jurisdiction of the courts of general jurisdiction, having the function not only of trial and judgment, but also of execution of the judgment. It seems from an examination of the authorities to be well-nigh unanimously declared that, in the absence of statute making a different provision, the jurisdiction of the appellate court over a given cause terminates whenever regularly, without inadvertence or fraud, it returns the record to the court of general jurisdiction. 2 Enc. Pl. & Pr. pp. 359, 384; 2 Spelling, New Tr. & App. Prac. secs. 733, 734; Hayne, New Tr. & App. sec. 293; Legg v. Overbagh, 4 Wend. (N. Y.) 188; cases collected in note, 21 Am. Dec. 118; Delaplaine v. Bergen, 7 Hill (N. Y.) 591; Browder v. M'Arthur, 7 Wheat. 58, 5 L. Ed. 397; Peck v. Sanderson, 18 How. 42, 15 L. Ed. 792; Underhill v. Jericho, 66 Vt. 183, 28 Atl. 879; Sullivan v. Speights, 14 S. C. 358; Caldwell v. Bruggerman, 8 Minn. 286 (Gil. 262); Dempsey v. Billinghurst, 7 S. D. 564, 64 N. W. 1124; Leese v. Clark, 20 Cal. 387; Richardson v. Chicago Packing & Provision Co., 135 Cal. 311, 67 P. 769; Ward v. Springfield F. & M. Ins. Co., 12 Wash. 631, 42 P. 119; State ex rel. Haskell v. Faulds, 17 Mont. 140, 42 P. 285. This apparently rests largely upon the doctrine that, when that act is done, the jurisdiction of the lower court, which has been suspended meanwhile, becomes re-established, and that both courts cannot have jurisdiction over the cause. Generally, too, it is held, in the absence of statute, that the power of an appellate court over its judgment, like that of courts generally, persists to the end of the term at which the judgment is rendered, and then absolutely terminates, except as it may be terminated earlier by the retransmission of the cause to the trial court.' The foregoing case may also be found reported in 11 A. & E. Ann. Cas. 857, where it is extensively annotated, cases being cited from nearly, if not quite, every state in the Union, as well as the federal courts, and the general rule deduced from them all by the author of the annotation is in accord with that we herein announce, **and is to the effect that the jurisdiction of an appellate court over a case ceases when it has regularly determined the issues involved, and caused its judgment in conformity with such determination to be entered, and the case is remanded to the lower court for such action as may be necessary.** Among the authorities which we have examined, and which have not been heretofore mentioned, either in this opinion or in the case of Ott v. Boring, supra, in support of this rule, may be noted the following: Horton v. State, 63 Neb. 34, 88 N. W. 146; Merchants' Nat. Bank v. Greenhood, 16 Mont. 395, 460, 41 P. 250, 851; Merchants' Nat. Bank v. Grunthal, 39 Fla. 388, 22 So. 685; Rowland v. Kreyenhagen, 24 Cal. 52; Trumpler v. Trumpler, 123 Cal. 248, 55 P. 1008; Putman v. Clark, 35 N. J. Eq. 145;

Bullion Min. Co. v. Croesus Gold & S. Min. Co., 3 Nev. 336; Finlayson v. Kirby, 127 N. C. 222, 37 S. E. 223; Lubbock v. Vince, 5 Tex. 415; Hopkins v. Gilman, 28 Wis. 512; Rud v. Pope County, 66 Minn. 358, 68 N. W. 1062, 69 N. W. 886; Seaboard Air Line R. Co. v. Jones, 119 Ga. 907, 47 S. E. 320; Zorn v. Lamar, 71 Ga. 85; Phelps v. Davis, 2 J. J. Marsh, 368."

In Wellsville Oil Co. v. Miller, 48 Okla. 386, 150 P. 186 189, the court said:

"It was the duty of the court, without motion or other act of defendants, to have proceeded to make such order as would fully comply with the said mandate of this court, 'to take such other and further proceedings herein as shall accord with said order and right and justice in the premises.' Said mandate not only vested the trial court with jurisdiction to make the order, disbursing the funds held in said court by virtue of said stipulation, which was made a part of the original judgment in the trial court, and the judgment affirmed by this court, but it was the duty of said court to make said order especially in view of the fact that the case had been fully adjudicated and finally disposed of in this court, which said order is not an order from which an appeal lies to this court. * * *"

It will thus be observed that the former judgment is not only the **law of this case,** but is **res judicata** upon every question involving title to the land in controversy. This is true because when final judgment is pronounced by a court of competent jurisdiction, the cause of action itself is extinct— it passes in **rem judicatem.** The foundation of the doctrine of both res judicata and the law of the case is that the parties have had their day in court; their rights have been put in issue and finally determined by a court of competent jurisdiction. It is the theory of the law that matters which have once been fully investigated between the parties and determined by the court, shall not again be contested, and that the judgment of the court upon matters thus determined shall be conclusive upon them. The parties having either been heard or having had an opportunity to be heard, it is in the public interest that litigation not be indefinitely protracted.

Nor does the effect of a former judgment depend upon its correctness, and it is no less conclusive because based upon a mistake of law. Similarly a judgment concludes not only matters that were in issue, but matters that might have been pleaded as a defense; if a party through oversight or neglect omits to make a defense, he is none the less bound, and a final judgment concludes both legal and equitable defenses. Johannessen v. United States, 225 U. S. 227, 65 L. Ed. 1066; Baker v. Cummings, 181 U. S. 117, 45 L. Ed. 776; Miles v. Caldwell, 2 Wall. 35, 17 L. Ed. 755; Williams v. Armroyd, 3 L. Ed. 392; Wilson's Ex'r v. Deen, 121 U. S. 525, 30 L. Ed. 980; American Express Co. v. Mullins, 212 U. S. 311, 53 L. Ed. 525; Frank v. Mangum, 237 U. S. 309; 59 L. Ed. 969; and Dowell v. Applegate, 152 U. S. 327, 38 L. Ed. 463, are among the many cases by the Supreme Court of the United States announcing the foregoing principles.

Pioneer Tel. & T. Co. v. State, 40 Okla. 417, 138 P. 1033; Prince v. Gosnell, 47 Okla. 570, 149 P. 1162; Kingfisher Imp. Co. v. Talley, 51 Okla. 226, 151 P. 873; Grimmett v. Grimmett, 80 Okla. 176, 195 P. 133; Oklahoma Moline Plow Co. v. Smith, 81 Okla. 61, 196 P. 962, are among the many previous decisions of this court which also adhere to it.

The case of Prince v. Gosnell, supra, was an action in ejectment to recover a certain lot in the town of Frederick. Because of defects in the petition, a demurrer was sustained. The plaintiff elected to stand upon his petition and appealed to the Supreme Court, where judgment was affirmed. After judgment of the Supreme Court, new issues were attempted to be injected into the cause. The question presented was whether the former judgment constituted a bar. This court in an opinion by Mr. Justice Hardy cited with approval Engle v. Legg, 39 Okla. 475, 135 P. 1058, to the rule that:

"Judgment in a former action involving the same subject-matter is conclusive not only as to defenses which were permitted in such action, but also as to all defenses which might have been presented."

Citing other cases, this court held the former judgment binding as to every matter which might have been pleaded or given in evidence, whether the same was in fact pleaded or not.

This court, in an opinion by Mr. Justice Hefner, it seems to me, correctly stated and followed the rule of the law of the case in Doyle-Kidd Dry Goods Co. v. Ingram, 126 Okla. 161, 259 P. 211, as follows:

"This court having held on a former appeal that the trial court should have directed a verdict for the defendant at the close of all the evidence, and, inasmuch as there is no substantial difference in the facts presented in this case from those presented in the case when it was here before, the decision of the former appeal is controlling."

The rule has been more recently reiterated

in White v. American Law Book Co., 157 Okla. 32, 10 P. (2d) 699, where in the second syllabus paragraph, this court announced the rule to be that:

"Judgment in former action involving same subject-matter is conclusive, not only as to defenses raised, but also as to all matters which might have been presented under pleadings."

But it is argued that this case comes within the exception to the general rule, that a manifest error has been committed and grave and serious injustice will result from adherence to the former judgment. In this I cannot agree.

Particular note is made of the admission of the defendant Carter Oil Company that the only evidence tendered to show administration proceedings in Adair county at the former trial was a certified copy of the appearance docket in case No. 301 in the county court of Adair county, which evidence was stricken from the record by the trial court. As the record stood before and now stands before this court, there is no evidence in the record of administration proceedings of any character in Adair county.

The question as to which county court was that having jurisdiction of the estate of Nancy Eli after the final account of the administrator was approved by the county court of Cherokee county, within the meaning of the congressional act vesting in such court authority to approve full-blood deeds of Nancy Eli, is a novel one, and one upon which the court then and now is guided by no altogether satisfactory judicial precedent. The reasoning of the former opinion is sound. Nancy Eli never lived in Adair county, for she died long before the county came into existence. Jurisdiction of the settlement of her estate, if determined by the laws in force during her lifetime, or at her death, was certainly by proper proceedings vested in the county court of Cherokee county and not elsewhere. At no time since the Adair county court was created has she ever lived in that county or had property there of any kind whatever subject to administration. To say that laws enacted after her death and conditions occurring after a full and complete administration upon her estate, either divested the Cherokee county court of jurisdiction, or vested jurisdiction elsewhere, to do what had already been completely done, is certainly of questionable legal soundness. Such a conclusion amounts to deciding that jurisdiction may exist where there is no conceivable judicial act to be performed.

This result it seems to me is an unsound novation in the law.

But it is not necessary for the purposes of this case for us to find that the former opinion is the opinion the present court would adopt were the case before us for the first time. The correctness of the former opinion is at least debatable, and we are directly confronted with the doctrine of the law of the case and of res judicata, which upon principle and under facts such as here, is much, stronger than the doctrine of stare decisis. For, in making the law of this case, in the former adjudication of the precise question at bar, the parties herein played an important part. They made the record in the trial court and here. They advanced for the court's consideration presumably every question of fact, every issue of law that they deemed advantageous to their contentions. If they omitted or neglected material matter, they are in part responsible if it was not considered; on the other hand, were the question one of stare decisis, it might well be urged that the court's attention had not been called to controlling issues in the former case to which the precise litigants were not parties.

To the doctrine that courts should be ever ready to right their own wrongs, I subscribe. Yet somewhere, some place, there must be a final determination of the question of who is right and who wrong. The shifting personnel of the court should not determine the law, and litigants should not be encouraged to prosecute numerous appeals in the hope that other judges may decide the same question differently.

Moreover, gravest considerations of public policy require that litigation not be so protracted as to invite and permit financially powerful litigants, aggrieved at the decision of one group of judges, to go to the hustings, defeat the judge or judges who decided adversely to them, and then resubmit the same case.

The peculiar vice of the instant practice will become apparent when it is noted that the former opinion when finally handed down was concurred in by all eight of the justices who heard it; that four of the justices of the present court agree that the former opinion should stand. One of the learned justices, who concurred in the former opinion, now concurs with the majority. Of seventeen justices of this court who have considered the respective rights of the parties, only five are found to say that the defendants are entitled to hold the land. How can it be

argued that such a judgment is **grossly** and **manifestly** wrong? Because five constitutes a majority of the nine judges who last heard this case, their opinion becomes the law. But how can court judgments so reached enjoy the full measure of public confidence and respect upon which, ultimately, their whole usefulness and authority depends?

Any judicial system where men are judges must be founded upon a concession that in some cases their decisions may be wrong. And often men differ as to what is right and what wrong. Otherwise, there would be no need for nine minds upon the bench or twelve upon the jury. But when a case has once been fairly tried and finally decided by the highest courts of the land, that should end the matter. A final judgment should never be disturbed except for the reasons and in the manner prescribed by the statutes. That considerable sums of money are involved should in no way alter the rule.

With reference to the attorney's contract and the Tucker deeds, a careful inspection of the records now before us fails to reveal any sufficient fact or circumstance tending to show that at the time the attorneys contract with Wilson was consummated or thereafter, any collusive agreement of any kind existed between Wilson, the Indian's attorney, and Tucker, who purchased their lands. The statutes of this state, section 4205. C. O. S. 1931, specifically authorize employment of attorneys at law upon a contingent fee basis. This provision of the law is obvious for the benefit of poor persons who otherwise could not employ counsel. That champerty statutes of Oklahoma, both by their terms and by previous decisions of this court, do not apply to a sale of Indian lands by the allottees or the heirs of such allottees of their inherited interest therein, seems well settled. Section 1940, O. S. 1931, a proviso of which the majority opinions seem to have overlooked, expressly exempts conveyances of interests in allotted lands by restricted Indians from its operations. The first syllabus paragraph in Sells v. Mooney, 79 Okla. 34, 190 P. 861, an opinion of this court by Mr. Justice Bailey, states the applicable rule as follows:

"1. Indians—Alienation of Land—Champerty. Where a restricted Cherokee Indian during such restrictions attempts to convey by deed a portion of his allotted lands, and his grantee enters into and holds possession thereof for more than one year, and subsequently, after the removal of such restrictions, said Indian by warranty deed conveys to another, the validity of the second conveyance is not affected by the champerty statute (section 2260, Rev. L. 1910), as the alienation of such land is controlled by congressional enactment.

"2. Same—Rule of Property. The doctrine of 'rule of property' cannot be applied to render valid conveyances made in violation of governmental policy, nor can decisions of this court rendered subsequent to the execution and delivery of the deeds relied upon be invoked to establish a rule of property to validate such deed."

Other cases announcing the same rule are: Whitmire v. Levine, 80 Okla. 21, 193 P. 884; Culp v. Bronaugh, 97 Okla. 198, 224 P. 175; Denny v. Ackers, 117 Okla. 274, 274 P. 34.

No serious question seems to have been raised by the Indians nor any one purporting to represent them, as to the reasonableness of the fee charged by Wilson, nor the adequacy of the price paid by Tucker for the Indians' interest in the land at the time the trial court in 1924, held the deeds of the defendants in the litigation to be valid and the Wilson contract and Tucker deed void. Nor were such questions raised during the years from then to May, 1928, during which time the cause was pending in the Supreme Court of the state of Oklahoma and in the Supreme Court of the United States. It is in evidence that during this period of time, the Indian grantees, who had sold to Tucker, counted themselves lucky for having sold, since their grantee, Tucker, had lost the case. Two county judges approved the transaction with full knowledge of all the details. One of the judges, having in mind all the circumstances, testified that he regarded the consideration paid by Tucker at the time as adequate; that he counted out the money in cash to the Indians in his office. Doubtless, knowledge of the certainty of a long and expensive court fight to get the land if the Indians owned it entered into the calculations of all parties. But in view of consideration hereinafter mentioned, I do not for the purposes of this case regard it as material whether the Indians received adequate consideration for the land or not. The trial court perhaps out of an abundance of precaution denied the application of Wilson and Tucker for an injunction to prevent prosecution of the Sams and Raymond lawsuit, and that case so far as the records show is still pending.

The majority opinions take refuge in equity to escape the results, which it seems to me, the plain letter of the law makes unavoidable in this appeal. Whether a mandate of this court is final or not, which I deem con-

trolling herein, is certainly a question of legal and not equitable cognizance. Similarly, whether the deeds the Indians first executed in 1916 are or are not valid is a pure question of law, and if they are void at law, equity should follow and not supplant the law. But equity, reason the majority opinions, prevents the raking up of old claims and their assertion years after to disturb the possession of those who have bought and at great expense developed rich oil holdings. Whether the Indians and their grantees are barred by limitations is again, however, a plain question of law. Only some eight years elapsed from the date the defendants took deeds and possession of the Indian lands until suit to recover was instituted. If defendants were in possession under void deeds, as plaintiffs assert, the statutes of the state (sec. 99, O. S. 1931) prescribe 15 years as the time within which suit may be timely brought to recover the property. Full-blood Cherokee heirs of allotted lands might have more and certainly could have no less time in which to assert their rights. This again is a question of law, governed by express statute rather than equity. And plaintiffs' suit in ejectment was clearly at law. As such the case was and is, it seems to me, controlled by the written Code, which defines the rights of the parties, rather than some unwritten one reposing in our consciences as chancellors. I do not think that courts in the face of written statutes should adopt for themselves their own ideas of what is right and what wrong. It was doubtless because of dissatisfaction with the rules of conduct, reposing only in the consciences of the lawgivers, that mankind so early adopted written codes. And where the written law is plain, I regard adherence to its mandate as the first duty of the judges of every court.

Yet I have not failed to consider the equities which the learned majority advance in support of their opinions. It is argued that the Indians were not adequately paid by Wilson and Tucker for their rights in the land in controversy. Yet it is decided that the deeds which they gave were void. **Surely it cannot be said that $750 is not enough to pay for a void deed.** And if it be true that the Indians were not adequately compensated for their rights in the land, the land should be restored to them. A suit to recover the land for them is still pending. It does not promote the ends of justice to take this valuable land from the Indians, if it was theirs when this suit was filed, and award it to the Carter Oil Company and its codefendants just to keep the Indians from paying too big a fee to their lawyer or to keep Tucker from buying the land too cheap.

It is traditional that from the days of William Penn and Peter Minuet, the Indian race has been the victim of the superior intelligence and business sagacity of the white man. In the always eager and sometimes greedy and unscrupulous race to obtain the rich oil lands of the Five Civilized Tribes, it cannot be said that pioneers in the oil industry, merely because they were first purchasers of rights in Indian allotments, were animated by merely altruistic motives. With the aid of an army of expert geologists and scouts, often with full knowledge that allotted lands were underlaid with fabulous wealth in oil, the rights of the Indian owners have as a rule been acquired for a trifle when the purchaser alone had knowledge of its potential value. The record indicates that the defendants paid the Indians in this case less than $4,000 for the land before any oil from it had been extracted; that this land has already produced over $280,000 worth of oil. Rare indeed have been the times when more than nominal sums were paid to Indians for oil leases upon their allotted lands, even in cases like this, where the government supervised the sale.

The white man drew the leases and the deeds and the laws under which they were to be construed, and, except where a positive statute forbade the sale, what the Indian had left as a general rule was just an oversight. It is because of a knowledge of this fact that I have scant sympathy for the attempt of those in possession of rich holdings in Indian oil lands when made defendants in suits of this character by Indian claimants to the land to draw the holy cloth about themselves, to plead the inequity of the Indian's claims, and to assail the ethics of his attorney. When the Indian gets himself a lawyer who teaches him the ways of the white man's laws on a contingent fee basis, of what concern is it to the defendant what attorney's fee he pays? Or whether his lawyer has been guilty of some breach of legal ethics? I would not be understood as condoning unethical conduct on part of attorneys, but it seems to me that correcting abuses of that character where they exist is more properly left to the State Bar Commission.

Or if the Indian sells his interest in the land in strict accordance with the law—if he gets something for what the adverse claimant says is worth nothing, how does it lie in the defendant's mouth to **defend** on

the ground that the Indian is being defrauded? If concern on part of the defendants for the Indian's rights is sincere, they should first admit that the Indians owned property and offer to restore it to them. It seems to me that the question properly before the court on the former appeal was whether the Indians owned any interest in the land of which they could be defrauded. If they did, whether Wilson and Tucker dealt fairly by them can be decided when the case presenting that issue is brought before this court.

Moreover, I cannot subscribe to a procedure by which, on no more substantial grounds than appear herein, a trial judge is twice reversed by this court on the same question in the same case, once when he decides the question one way, and again when he decides it the other way.

No better illustration of the sound policy which requires that there be an end to litigation can be found than that evidenced by the record in the case at bar. This record discloses that a suit begun in 1924 has been to the Supreme Court of the United States and back again, twice tried in the trial court, and twice in this court, yet the parties are precisely where they started. The present appeal was lodged in this court January 1, 1929. Many other appeals that have been here equally as long and some that have been here longer, remain undisposed of. It is of grave public concern that litigants not be permitted to take up the time of the court with endless appeals presenting the same question.

In May, 1928, this court by its mandate awarded possession of the land in controversy to the plaintiffs. As the record now stands, that mandate has been superseded with a $15,000 bond, notwithstanding the record shows that this court once fixed supersedeas at $350,000 for appeal when even less was in issue. Apparently the reason this case is now before the court, so far as possession of the land is concerned, is because the Carter Oil Company and its codefendants have ignored the former judgment. It is even suggested by the majority that the trial court did not observe the mandate. It seems to me that a more effective remedy for that condition, if true, can be found than to vacate the judgment. We ought not invite trifling with this court's mandates.

If judgments of the highest court of this state are to be lightly regarded, if they are to be set aside merely because later judges think the case should have been decided differently, it seems to me that judicial decisions become mere literary essays, interesting and instructive to read, but decisive of nothing and binding on no one. It is a recognition of this fact that makes the doctrine of the law of the case, along with the doctrines of stare decisis and res judicata, indispensable to our system of jurisprudence. Adherence to these salutary doctrines give a confidence to litigants that the courts will interpret and apply the law and not make it; that the law will be the same to that branch of the government to which it was assigned by the Constitution—the Legislature.

For the reason stated, I dissent from the opinion and special concurring opinions of the majority.

I am also authorized to announce that Mr Justice CLARK concurs in this dissenting opinion.